## Richmond

NORRIS G. ARMENTROUT, ET AL.

v.

JON M. FRENCH, ET AL.

October 5, 1979.

Record No. 780065.

Present: All the Justices.

Colin J. S. Thomas, Jr. (*John W. Sills, III; Timberlake, Smith, Thomas & Moses,* on briefs), for appellants.
*Carter R. Allen (Allen, Dalton & Watkins,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this civil appeal, potential purchasers of residential real estate successfully defended below two actions for the alleged breach of their contract to buy the subject property. The main question we will consider is whether there was credible evidence to support the jury's decision, approved by the trial court, in favor of the purchasers.

In October of 1975, appellees Jon M. French and Helen V. French, his wife, defendants below, executed a written contract to buy a dwelling, and appurtenant real estate, near the City of Waynesboro, from appellants Norris G. Armentrout and Alma N. Armentrout, his wife, two of the plaintiffs below. The sellers were represented in the transaction by an employee of appellant Simon M. Painter, Sr., t/a Valley Realty, another plaintiff below.

Subsequently, when the purchasers refused to perform the contract, two actions were instituted against the Frenches in the General District Court of Augusta County. Valley Realty sued to recover a sales commission in the amount of $1,500.00, and the Armentrouts sued to recover damages of $2,552.89. Both civil warrants alleged the respective amounts were due because of "breach of contract." The

Frenches removed the actions to the circuit court. In their affidavits of substantial defense filed in the circuit court under Code § 16.1-92, the Frenches denied they had breached the contract and asserted that "the existence of a defective septic system in the house offered for sale rendered the house unsaleable and unfit for occupancy without correction." The cases were consolidated and tried before a jury which rendered verdicts in favor of the purchasers in each case. We granted the plaintiffs an appeal from the trial court's December 1976 orders which overruled their respective motions to set aside the verdicts and which entered judgments for the defendants.

At the outset we note that no bills of particulars were filed by plaintiffs in the circuit court to amplify the bare allegations of the civil warrants. So initially we will indicate the theory upon which the actions were tried below by summarizing relevant instructions that are unchallenged on appeal and which thus are the law of the case. The trial court told the jurors that if they believed from a preponderance of the evidence that the Frenches entered into the contract of purchase of October 10, 1975 with the Armentrouts, that the Frenches refused to perform the contract, and that the Frenches "were not justified in refusing to perform" the contract "by any act or default on the part of" the Armentrouts, then a verdict must be found for plaintiffs. In several instructions the trial court stated that only one material fact was in issue which was:

[W]hether or not the septic system was in such state of disrepair that it rendered the house unsalable and unfit for occupancy.

The court also instructed the jurors that unless they believed "from a preponderance of the evidence that the smell in the recreation room of the house was caused by a problem with the septic system then the smell or odor by itself, no matter how obnoxious, shall not be considered by the jury."

The court further instructed the jury that in order for defendants "to avoid their contractual obligations" the burden was on the Frenches to prove by clear, cogent and convincing proof: (1) that the Armentrouts "expressly or by a course of conduct were guilty of misrepresentation or concealment with regard to the septic system"; (2) that the "septic system was in fact in such state of disrepair as to render the house unsalable and unfit for occupancy"; and (3) that such misrepresentation or concealment, if proved, induced the defendants to enter into the contract. The court stated that unless the defendants had "come forward" with such proof, then the jury must find for the plaintiffs.

Consequently, it is apparent that our sole inquiry in this main phase of the appeal is to determine whether there was sufficient credible evidence, which was clear, cogent and convincing, to prove that the septic system was in such a state of disrepair to render the dwelling unsalable and unfit for occupancy. We will now examine the evidence touching this issue in the light most favorable to defendants who come here armed with the verdict of a jury which has been confirmed by the trial judge.

The house in question was situated on a lot of approximately 1.5 acres and was described as a "split foyer house" with four bedrooms. Within the lower level of the home was a recreation room containing a fireplace. The home had been built in 1971 by a local electrical contractor, who occupied it for eight or nine months and sold it to one McIntosh. The Armentrouts purchased it from McIntosh and, at the time of the contract, had occupied the home for about five months. Testimony revealed that Armentrout had "put the house on the market" about one month after he purchased it.

The Frenches, parents of three young children, were planning to buy their first home. Mr. French, an employee of Virginia Electric and Power Company, had reviewed three or four books "on real estate purchasing" to prepare for the venture.

In October of 1975, several days before the contract in issue was executed, Mrs. Jean Byrd, an employee of Painter and Valley Realty, took the Frenches to see the Armentrout dwelling about 6:30 p.m. on a Wednesday. The visit had been prearranged and the Frenches stayed inside the house about one-half hour. As soon as they entered the home, the Frenches noticed a "heavy cooking odor" which was "real garlicky or oniony." After speaking to the Armentrouts, who apologized for the strong odor, the Frenches went "downstairs" and looked into the recreation room where the Armentrouts' older daughter was sitting, apparently with her "boyfriend." The room was "very dark" and dimly lit. The Frenches remained there only a few minutes, noticing and smelling a fire which was "roaring" in the fireplace; no offensive odor was detected.

As the group was inspecting the upper level of the home, Armentrout mentioned to French that the septic tank had been recently "pumped" or "drained." French was surprised by the statement because, he testified, he had previously lived in a house where the septic tank did not require cleaning for 11 years. French then asked Armentrout the reason for the pumping and Armentrout answered, "For my own satisfaction." Upon Armentrout's assurance that the septic system "checked fine," French pursued the subject no further at that time.

During the initial visit, according to the testimony, the Armentrouts "kept reiterating" that the reason they were leaving their home so soon after they had purchased it was that he had been transferred by his employer to Covington, Virginia. Byrd testified, however, that Armentrout had told her that their daughter's dissatisfaction with her new school necessitated the move. Armentrout, who was living in Staunton at the time of the trial held in December of 1976, testified that he sold the home because "I am going back to Covington, after this year," and "my little girl wasn't satisfied with the school down there."

As the Frenches' initial visit to the home was ending, the Armentrouts told French he was at liberty to examine the home again at any time as long as the visit was prearranged. Prior to execution of the contract, French returned to look through the home accompanied by his "supervisor at work." On that day, the weather was "like Spring," and the men were "in shirt sleeves." At the time, they detected no odor in the house except the smell of a fire again burning in the recreation room fireplace. French quoted his supervisor as commenting, upon leaving the home, that in view of the warm weather it was "awfully strange" the Armentrouts had a fire burning in the recreation room.

Because, in Mrs. French's words, they "fell in love with [the house] right away" and because they "didn't have any reason to distrust anybody," the defendants executed the contract to purchase the home for $44,000.

The contract called for the transaction to be closed on November 28, 1975. By agreement of the parties, the Armentrouts moved on November 1 and delivered possession of the premises to the Frenches who began moving into the home on November 6; they had not been in the dwelling since the two October visits.

The Frenches entered the house, which "had been closed up for a day," at the lower level through a utility room. French testified that when they opened the door to the recreation room, "oh, gosh—that odor hit us." Mrs. French testified the smell "just practically knocked you over." French compared the odor to that present in a filthy public toilet. Mrs. French, a registered nurse, concluded that the smell came from urine and compared the odor to that from an outdoor toilet. At the time, they noticed a bottle of room deodorant on the mantle over the fireplace.

During the next several days, the Frenches tried without success to eliminate the smell by washing the walls of the lower level of the home and by repeatedly cleaning the recreation room and the "two-tone green shag" rug covering the room's cement floor. After the cleaning

efforts over the general area of the ground level of the home failed to eliminate the offensive odor, French noticed the smell seemed stronger in one corner of the recreation room. He raised the rug in that area, saw that it was stained underneath, and noticed "the saturation" which had taken place at that location.

In the process of cleaning, French also discovered that the floor drain in the utility room "had been stopped up" so that water would not flow out. In addition, the toilets began to malfunction after the family had lived in the house a few days; when flushed, the water appeared ready to overflow the bowl to the degree that the family stopped using the commodes.

As the result of these cascading problems, French telephoned Armentrout. Armentrout first denied and then admitted he had been aware of the smell but claimed to have no knowledge of the cause of the problems French was experiencing. Armentrout stated he had cleaned the recreation room rug which "seemed to help [the odor] for a little while" but the smell would "return and then go away, and then come—and be stronger at times than others." Armentrout told French he had suspected "a septic tank problem, or a leakage" but when he had the system "pumped and checked," he had "eliminated that" as a cause of the problems.

During November, at French's request, C. T. Bradley, a local building contractor, examined the dwelling. Bradley testified that the odor was so strong on the day he went to the home that it brought tears to his eyes and burned his eyes "so bad [he] couldn't stand it." Bradley stated the odor smelled like urine and concluded that "a septic tank was spilling out, or overrunning, or something like that." When asked his opinion "about the livable condition of that house with that odor," Bradley opined that he would not move his family into the house under the conditions existing there.

French, believing a "serious septic problem" existed, then consulted an attorney who notified the realtor that the Frenches would not close the purchase. Thereafter, Byrd contacted the Frenches, stating a desire "to work the thing out."

As a result, the realtor sent Raymond Beathe to meet French at the home on November 25 to evaluate the problems. Beathe, employed by a construction company, was the person who had drained the septic tank for Armentrout. Following the examination, Beathe told French the cause "could be septic tank leakage." Beathe examined "the tanks behind the toilets" and told French the floats in the tanks had been altered so the tanks would not fill up with water. When French asked the effect of such alterations, Beathe stated that "a lot

of people do this, you know, when they have water flushing out onto the floors frequently . . . [t]hey'll do this so they don't get as much water, or hardly any at all, out on the floor—or sometimes none."

While Beathe was at the home, the Armentrouts and realtors Painter and Byrd arrived. During the ensuing discussion, Byrd asked Beathe what should be done "to check out the system" in order to "once and for all, . . . clear the air" and determine the cause of the problems. Beathe replied there was "only one way . . . and that's to dig it up." French then proposed that the system be dug into and offered to pay for the digging if no defect was discovered. He told the group that Dr. Malcolm Tenney, the regional medical director for Northwest Virginia for the Virginia State Department of Health, had agreed to examine the system when it was uncovered. French's request to dig was refused, Painter stating, "Mr. French, as far as I'm concerned, you signed for this house, and you've got a problem." The meeting ended with French referring Painter to French's attorney for any further discussions about the transaction.

At the trial, Dr. Tenney testified the "only way" to test a septic system which is suspected of leaking is to dig up the pipe connecting the house to the septic system and to examine the pipe to determine whether it is ruptured. He also stated that "slow [emptying] toilets" indicate, among other things, a "stoppage" in the pipe connecting the house to the septic system, a break in such pipe, a filled septic tank, or a flooded septic drain field. Tenney also described other causes of a malfunctioning septic system, such as a tilted distribution box result-ing from settling of the earth or from pressure of heavy equipment working on the surface of the ground. He also testified that cleaning the septic lines using a "Roto-Rooter" often breaks the pipe at a critical juncture as it leads into the system. The evidence disclosed that Armentrout, after he had lived in the house for about two months, had a "Roto-Rooter" used to unclog the septic system.

The evidence offered by the plaintiffs tended to show that the odor and problems experienced with the sewage disposal were not caused by a defective septic system. For example, the urine odor was at-tributed to pets housed by owners previous to the Armentrouts or to a lack of water in the sewer drains which permitted sewer gas to leak into the home. Witnesses called by the plaintiff had examined the system at various times and testified that it operated properly. Warren D. Drumheller, who, along with his wife, purchased the home in March of 1976 from the Armentrouts for $43,000.00 through Valley Realty, testified that he had experienced no difficulty with the septic system during the nine months of his occupancy to the time of trial. He stated

that the odor was eliminated from the recreation room when he replaced the rug. He did say, however, that the odor lingered in one of the lower-level bedrooms. Drumheller also testified that he found rags stuffed both in the clothes washer drain downstairs and in the utility room floor drain. Armentrout denied knowledge of any malfunction of the septic system, denied placing rags in the drains, denied altering the float assembly in the toilets, and denied having any work done on the sewer system prior to the sale to the Drumhellers.

Plaintiffs contend, first, that as a matter of law the defendants failed to establish prima facie, by clear, cogent and convincing evidence, that the septic system was defective and that the Armentrouts either expressly, or by a course of conduct, were guilty of misrepresentation or concealment with regard to the septic system so as to warrant rescission of the transaction. We do not agree.

We think the defendants carried the required burden sufficient to raise a jury issue on the foregoing questions. Reasonably to be inferred from the facts heretofore recited is that the septic system was defective. Bradley concluded that the septic tank was "spilling out" and "overrunning," Beathe said the cause of the odor "could be septic tank leakage," and Tenney, who was prevented from making a meaningful inspection by plaintiffs' refusal to allow the digging, testified that the problems being experienced by the Frenches could be caused by a malfunctioning system for any number of reasons. When this evidence is coupled with the witnesses' description of the odor, the logical conclusion is that the sewage disposal system was defective at the time the contract was executed.

Furthermore, the evidence was entirely sufficient to raise a question for the jury upon whether the Armentrouts were guilty of fraudulent misrepresentation. The jury properly could have concluded the Armentrouts were aware of the septic tank malfunction and of the offensive odor existing during the period immediately prior to French's first visit. Rags had been stuffed in drains which could have prevented the sewage from backing up into the lower level of the home. The mechanism in the toilets had been altered to reduce the flow of water and the hazard of overflowing. The jury could logically have concluded the Armentrouts performed these acts and thus knew of the septic problem. Also, the rug in the recreation room furnished evidence of a long-standing odor and a liquid problem, certainly known to the occupants of the house. In addition to those circumstances, the evidence showed that the Armentrouts decided to sell the home within months of their occupancy, assigning conflicting reasons for the sudden move. Furthermore, the jury reasonably could have concluded that the

Armentrouts attempted successfully to mask the foul smell by using fires and cooking odors when the prearranged visits were scheduled. And finally, the jury properly could have believed that the refusal to accept French's offer to pay for digging up and inspecting the system was a further indication of the plaintiffs' efforts to conceal a known defective condition.

■ Urging that the doctrine of *caveat emptor* applies to the transfer of real estate with respect to the physical condition of the premises, plaintiffs argue, second, that the Frenches were bound to accept the property in its October 10, 1975 condition because of the terms of the purchase agreement and because of the Frenches' conduct prior to execution of the writing. Plaintiffs point to paragraph 9 of the printed contract which provided:

> Purchaser represents that an inspection satisfactory to Purchaser has been made of the property, and Purchaser agrees to accept the property in its present condition except as may be otherwise provided in the description of the property above.

Plaintiffs contend, assuming for purpose of argument that a fraudulent misrepresentation was made, that as a matter of law the Frenches had no right to rely on such misrepresentation. They argue that French was put on notice that the septic system might be defective by Armentrout's statement during the first October visit that the tank had been pumped. Accordingly, plaintiffs argue, defendants were under a duty to make inspections and to ascertain the true condition of the premises, and having failed so to do, defendants cannot now avail themselves of the alleged misrepresentation, *citing Poe* v. *Voss,* 196 Va. 821, 86 S.E.2d 47 (1955), and *Masche* v. *Nichols,* 188 Va. 857, 51 S.E.2d 144 (1949). We reject this contention.

The principle of law set forth in *Poe* and *Masche* is that a purchaser of real estate must discover for himself the true condition of the premises if he has information which would excite the suspicions of a reasonably prudent person. *Horner* v. *Ahern,* 207 Va. 860, 864, 153 S.E.2d 216, 219 (1967). But a very important exception to that rule is that the seller "must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make." *Id.* Defendants' evidence here brings their case within the foregoing exception. In response to French's inquiry during the first visit about the condition of the septic system, Armentrout assured French that it "checked fine" and that "everything works fine." At the same time, according to defendants'

evidence as we have already said, Armentrout knew of the smell, knew a "Roto-Rooter" had been used to clear the system, knew of the rag-stuffed drains and knew of the sluggish toilets. Yet Armentrout did not disclose any of this information which was relevant to French's inquiry. Thus, prior to the execution of the contract, diverted by Armentrout's conduct, French justifiably thought he had made the satisfactory inspection referred to in paragraph 9 of the contract. He also was distracted at that time from making further inquiry on the subject by the affirmative misleading statements of fact by Armentrout.

■ Finally, plaintiffs contend the trial court erred in giving Instruction F.* Mistakenly characterizing the charge as a finding instruction, plaintiffs argue it was misleading, incomplete and vague. They note it was patterned after opinion language in *Jefferson Standard Ins. Co.* v. *Hedrick,* 181 Va. 824, 833-34, 27 S.E.2d 198, 202 (1943), quoted in the dissent in *Poe* v. *Voss,* 196 Va. at 828, 86 S.E.2d at 51, which, they say, was inappropriate to be included in an instruction in this case. Plaintiffs argue the instruction did not impose upon defendants a burden to establish the fraud by clear, cogent and convincing proof nor did it impose upon defendants the burden to prove the existence of the material fact that the system was so defective as to render the house unsalable and unfit for occupancy.

We do not think the trial court committed reversible error in giving the instruction. The defendants' burden upon the fraud and materiality issues had been fully and adequately set forth in other instructions. Perhaps Instruction F was unnecessary, but we do not think the jury could have been misled in view of the provisions of the other instructions dealing in clear terms with the one issue of fact in the case.

For these reasons, the judgments below will be

*Affirmed.*

---

*Instruction F provided:

The Court instructs the Jury that if Mr. Armentrout represents as true what is really false, or conceals the difficulty he had experienced with the septic system in such a way as to induce a reasonable person to believe it, and Mr. and Mrs. French, to whom the representation is made, or from whom the facts are concealed, act on it, believing that no difficulty in the septic system has been experienced, there is such fraud as will justify a rescission of the Contract of Sale. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other, it is actual.

POFF, J., concurring.

I concur in the Court's conclusion and the *ratio decidendi*. I think it is important, however, to emphasize that the analysis rests upon the law of the case as defined in the instructions to the jury.

In my view, the law of the case is not the law of Virginia. Contrary to the trial court's instruction, a purchaser of a house who seeks to rescind an executory contract of sale for fraudulent misrepresentation concerning the condition of the property need not show that the property was so defective as to be "unsaleable and unfit for occupancy". A defect of less consequence may be a fact material to the formation of the contract. Misrepresentation of such a fact may support rescission for fraud in the inducement. *See, e.g., Brame* v. *Guarantee Finance Company,* 139 Va. 394, 408, 124 S.E. 477, 481 (1924); *Max Meadows Land and Improvement Co.* v. *Brady,* 92 Va. 71, 77, 22 S.E. 845, 847 (1895).