## Richmond

NORMAN V. WATSON, ET AL., ETC.

V.

AVON STREET BUSINESS CENTER, INCORPORATED

Record No. 810678.

January 20, 1984.

Present: All the Justices.

*John D. Epps (David Craig Landin; McGuire, Woods & Battle,* on briefs), for appellants.

*James E. Treakle, Jr. (Charles R. Haugh; Forbes R. Reback; Haugh & Treakle,* P.C., on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

In this action in tort for deceit arising out of the sale of a warehouse, we must determine whether the plaintiff presented evidence sufficient to frame a jury issue of fraud in the inducement.

Appellants were members of a partnership which owned a warehouse in Charlottesville.[2] They listed the property for sale through Douglas Zerkel, a real estate broker. Zerkel interested John B. Hull in the property. After considerable study of the property, Hull negotiated a price reduction, formed the appellee corporation and purchased the property in the corporate name in 1976.

In 1978, the buyer brought this action against the sellers, alleging that they had fraudulently concealed a defect in the warehouse roof and had wilfully misled him with respect to this defect

---

[2] The partners were Norman V. Watson, Karen G. Watson, G. Cope Stewart, III, Thomas D. Webb, III, Carol B. Webb, Ben T. Austin and Norma J. Austin, General Partners, d/b/a Avon Street Limited Partnership.

during the negotiations. At trial, the sellers unsuccessfully moved the court to strike the buyer's evidence and renewed the motion at the close of all the evidence. The jury returned a verdict for the buyer for both compensatory and punitive damages. Sellers' motion to set aside the verdict was denied and final judgment was entered, from which the sellers appeal. Our review of the evidence brings us to the conclusion that the motion to strike should have been granted.

The warehouse contained about 48,000 square feet, was rectangular, and extended 480 feet from north to south. It was divided by fire walls into four bays which were leased to different tenants. The fire walls extended through the roof and rose about thirty inches above it. Because of the topography, the southern end of the building was at a higher elevation than the northern end. Witnesses for both parties stated that an observer standing at the southern end of the roof would have a general view of the entire roof.

The roof was flat and consisted of successive layers of insulation, felt, tar paper, and tar coating. It was originally covered with a coat of aluminum paint. In 1974, fire damaged the southernmost portion of the roof. The sellers adequately repaired the damage. In April 1975, high winds peeled back a section of the roof at the northwest corner. The sellers made an insurance claim for this wind damage, received $8,121.00 insurance proceeds, but spent only $1,400.00 on repairs of a temporary nature. The buyer's cause of action was based upon the alleged concealment of the inadequacy of these repairs.

Mr. Hull, the purchaser, was experienced in matters relating to real estate of this kind. He owned a similar warehouse in Northern Virginia, was a graduate of the U.S. Military Academy, held a degree in engineering, and had attended two years of law school. Before agreeing to purchase the warehouse in Charlottesville, he requested, received, and examined the sellers' business records relating to the property. These records included the leases, check stubs, and records of expenses and receipts. He interviewed several tenants and made several personal inspections of the premises with friends and relatives, one of whom had been an owner of shopping centers and another of whom was a builder. He personally climbed to the roof and examined the area at the southern end where fire damage had been repaired, but testified that he did not examine the rest of the roof. Referring to the area where the

wind damage had occurred at the northwestern corner, he testified, "I never went up there until afterwards."

The sellers' manager and the contractor who repaired the wind damage both testified that the repairs at the northwest corner were obvious, because the repaired area was black in color, in contrast to the original aluminum paint surrounding it. The buyer called a roofing contractor as an expert witness who agreed that such a color contrast would be normal.

Hull testified that he was aware of the importance of a good roof. He stated that he asked the sellers' agent, Zerkel, about the roof during negotiations prior to the sale. He testified that Zerkel said that the roofer who installed it had a good reputation and stated that it was a "25-year roof" and "a good roof," but that there was no guarantee on it. He said that Zerkel specifically mentioned the 1974 fire damage on the southern end of the roof, but said that it had been repaired in a workmanlike manner. Hull testified that Zerkel said nothing about the 1975 wind damage or its subsequent repairs, and that he climbed to the roof for the sole purpose of examining the repairs to the fire damage at the southern end because Zerkel had specifically mentioned them. Satisfied with what he saw, he made no further examination of the roof. He stated that it was impossible to observe the entire roof from the southern end because of the projecting fire walls.

Among the financial records which the sellers turned over to Hull for examination prior to the sale were records showing the receipt of insurance proceeds in the amount of $8,121.00 in 1975, marked "repair wind damage." Hull did not notice this item, did not talk with the tenant who leased the area affected by the wind damage, and was unaware at the time of settlement that the wind damage had occurred or that any repairs had been made at the northern end of the roof.

During the second winter after the sale, leaks developed in the northern end of the roof. At this time the buyer discovered that the leaking area had suffered wind damage in 1975, that the sellers had received insurance proceeds to cover full repairs, that only a small part of the insurance funds had been actually spent for such repairs, and that the contractor who had done the work had characterized the repairs as "temporary." The contractor, in a letter to the owners written soon after the work was done, warned "the roof has not been properly prepared for an extended period

of exposure to the elements and could leak if not permanently repaired soon."

At trial, the buyer contended that the condition of the roof had been wilfully concealed by the sellers, that the sellers' agent had made express misrepresentations of material existing fact with respect thereto, and that the agent's remark about the 1974 fire damage was made to throw the buyer off guard as to the wind damage and divert him from prudent examination of the rest of the roof. In support of its claim for punitive damages, the buyer relied upon the sellers' receipt of insurance proceeds covering full repairs, but expenditure of only a small part of them for temporary repairs, as sufficient evidence of malice to frame an issue for the jury. The trial court agreed, overruled the motions to strike the evidence, and submitted the case to the jury as to both compensatory and punitive damages.

We have recently reaffirmed Virginia's adherence to the common law doctrine of *caveat emptor* as to sales of real property. *See Kuczmanski* v. *Gill,* 225 Va. 367, 302 S.E.2d 48 (1983). The doctrine affords no protection to a seller who makes false representations of a material fact, constituting an inducement to the contract, on which the buyer had a right to rely. *Robberecht* v. *Maitland Bros.,* 220 Va. 109, 111-12, 255 S.E.2d 682, 683 (1979). Mere expressions of opinion, however, do not rise to this level and do not constitute fraud. *Kuczmanski,* 225 Va. at 370, 302 S.E.2d at 50; *Poe* v. *Voss,* 196 Va. 821, 825, 86 S.E.2d 47, 49 (1955). In the case before us, the only express representations concerning the roof were made by Zerkel, the sellers' agent, to the effect that it was a "25-year roof" and "a good roof." These statements fall into the latter category. They are typical seller's talk, expressions of opinion insufficient to frame a jury issue in an action for deceit.

The buyer, however, relies on the exception to the doctrine of *caveat emptor* set forth in *Armentrout* v. *French,* 220 Va. 458, 258 S.E.2d 519 (1979). There we said: "[A] very important exception to [*caveat emptor*] is that the seller 'must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make'." *Id.* at 466, 258 S.E.2d at 524 (quoting from *Horner* v. *Ahern,* 207 Va. 860, 864, 153 S.E.2d 216, 219 (1967)). Both *Armentrout* and *Horner* were cases in which it was alleged that a seller, having knowledge of a material fact which he con-

cealed, made a misleading statement calculated to forestall further inquiry and examination by the purchaser.

In the case at bar, nothing was done to throw the purchaser off his guard, or to divert him from inquiry and examination. He was told that there was no guarantee on the roof. He was given a list of tenants and permitted to interview them. If he had pursued the inquiry, he could have discussed the matter with the tenant whose roof had leaked in 1975. He was given business records which, if fully examined, would have disclosed the insurance settlement for the 1975 wind damage. He was given ample opportunity to examine the roof directly, but stopped short of examining the area where the wind damage had been repaired although the repairs would have been obvious.

Zerkel's reference to the fire damage at the southern end of the roof cannot be relied on as a statement which misled the buyer by diverting him from inquiry and further examination, because it did not have any such effect. The buyer undertook an extensive examination thereafter, even though he did not pursue it as far as prudence might have required of him.

Even if Zerkel's remarks could be characterized as an effort to divert Hull from further examination of the roof, they would be insufficient, in the circumstances of this case, to frame a jury issue as to fraud. As we held in *Poe* v. *Voss,* 196 Va. at 826-27, 86 S.E.2d at 50, if a buyer, having received a positive representation of material fact, is directed to the sources of information and undertakes an examination of the facts for himself, he is charged with all the knowledge which he might have obtained had he pursued the inquiry diligently to the end. He cannot, in such circumstances, complain that he was misled by the seller's representation, however false it might have been, because he was no longer justified in relying upon it. "He is nonetheless, by virtue of the fact that he investigated partially, bound by all that a complete investigation would have disclosed." *Harris* v. *Dunham,* 203 Va. 760, 768, 127 S.E.2d 65, 71 (1962). Under such circumstances, "he will not be heard to say that he relied upon the previous misrepresentation of fact." *Masche* v. *Nichols,* 188 Va. 857, 868, 51 S.E.2d 144, 148 (1949).

Because the evidence of fraud in the inducement was insufficient to take the case to the jury as to compensatory damages, there was, *a fortiori,* no basis for an award of punitive damages. *Zedd* v. *Jenkins,* 194 Va. 704, 706-07, 74 S.E.2d 791, 793 (1953).

For these reasons the judgment will be reversed and final judgment entered here in favor of the sellers.

*Reversed and final judgment.*