MERIDIAN TITLE INSURANCE
CO., Plaintiff,

v.

LILLY HOMES, INC., and Frederick V.
Lilly, II, Defendants and Third
Party Plaintiffs,

v.

Joseph H. CHOPP, Jr., U.S. Titles, Inc.,
R.H. Driscoll Development Corp., and
Richard H. Driscoll, Third Party Defen-
dants.

Civ. A. No. 89–1078–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 28, 1990.

Robert G. Scott, Cole, Raywid & Braverman, Washington, D.C., for plaintiff.

Robert J. Segan, Kass, Skalet, Sefan & Spevack, Annandale, Va., Robert A. Payne and James A. Watson, II, Surovell, Jackson, Colten & Dugan, Fairfax, Va., Gerald R. Walsh, Walsh & Cremins, Fairfax, Va., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This action for fraud and breach of warranty in connection with the sale of real property was brought by Meridian Title Insurance Company ("Meridian") in its own right and as subrogee to the rights of its insured, Veronica Cahill. Defendants, Fredrick V. Lilly, II and Lilly Homes, Inc. filed a Third Party Complaint seeking contribution from U.S. Titles, Inc., R.H. Driscoll Development Corp., Richard H. Driscoll individually and Joseph H. Chopp, Jr.

The case was heard without a jury on February 28, 1990. At the close of Plaintiff's case the defendants moved for a directed verdict.

### Findings of Fact

1. In 1983, Lilly Homes and Driscoll Development entered into an oral agreement to form a joint venture for the purpose of acquiring building lots in Northern Virginia, and eventually building and selling homes on those lots.

2. The two corporations acquired a total of six lots. Two homes were built on lots in the Summerwood subdivision, and one home was built on a lot in the Springwood subdivision.

3. In late 1984, the parties agreed to terminate their joint venture. At that time, they owned three lots on which homes had not been completed: Lot 13, Cheshire subdivision, and Lots 6 and 14, in the Sugar Mill Meadow subdivision.

4. The agreement to terminate was an oral agreement, and it provided that Lilly Homes would be entitled to a full interest in Lots 6 and 14, Sugar Mill Meadow, and be fully responsible for the balance of the loans thereon; and Driscoll Development would be entitled to a full interest in Lot 13, Cheshire, and be fully responsible for the balance of the loans thereon.

5. In December, 1984, Lilly Homes signed a Deed conveying its interest in Lot 13, Cheshire, to Driscoll Development. The balance due on the construction loan secured by that lot was paid off at that time. A settlement statement was signed by the parties showing no amounts owed from Lilly Homes, or from the joint venture, to Driscoll Development. No further money was claimed by Driscoll Development from Lilly Homes at that time.

6. In July of 1985, Lilly Homes wrote to its construction lender asking it to take Driscoll Development off the title and off the construction loans for Lots 6 and 14, Sugar Mill Meadows. The letter followed several phone conversations Frederick Lilly had with the loan officer regarding this.

7. The lender, Epic Mortgage ("Epic"), was affiliated with Community Savings and Loan Association of Maryland. During this time, Epic had become involved in a freezing of assets and conservatorship by the State of Maryland, which impaired its efficiency and ability to process requests from borrowers. Epic did not remove Driscoll Development from the title to these two lots.

8. In the summer and fall of 1985, Lilly Homes built a home on Lot 14, Sugar Mill Meadow. Lilly Homes designed, built, marketed, and sold the home without any contribution, financial or otherwise, from Driscoll Development.

9. In October of 1985, the property was sold to Veronica Cahill ("Cahill").

10. There were two real estate brokerage firms through which the contract was placed: Chain Bridge Realty and Town and Country Properties. Veronica Cahill was an agent for Chain Bridge Realty. Cahill selected Joseph Chopp ("Chopp") to be the settlement attorney. Chopp was hired to

do settlement work for both the purchaser and the seller in connection with the settlement of this sale.

11. There was one title search ordered in connection with this transaction. U.S. Titles was hired by Chopp to perform the title search. U.S. Titles was provided with a copy of the contract at the time that the title search was ordered.

12. U.S. Titles performed the title search and prepared the title insurance binder in this transaction as an agent for plaintiff Meridian Title Insurance Company ("Meridian"). U.S. Titles in fact provided such services to Meridian on a regular and continuing basis.

13. The title search conducted by U.S. Titles found that title to the property was, according to the last Deed in the chain of title, vested in "Lilly Homes, Inc., and R.H. Driscoll Development, Inc., a joint venture." This was noted on the "cover sheet" for the title abstract prepared by the title abstracter.

14. From the cover sheet for the title search, a title insurance binder was prepared by a U.S. Titles typist. The typist made a mistake in transcribing information from the cover sheet, and typed the "vesting clause" in the top portion of the binder to state that title was vested in Lilly Homes, Inc., without mentioning R.H. Driscoll Development, Inc.

15. The binder and cover sheet were reviewed by either Jean Printz, President of U.S. Titles, or David Carr, the Vice President of U.S. Titles, before the binder was sent out of the U.S. Titles' office, but the error was not discovered. The binder was then sent to Joseph Chopp, the settlement attorney. Chopp reviewed the binder, and prepared the Deed for signature by the seller.

16. The binder sent to Chopp stated that the title was vested in Lilly Homes, Inc., by virtue of a Deed recorded in Deed Book 5998 at Page 109 among the land records of Fairfax County, Virginia. It further stated that title was subject to: (a) a Deed of Trust from Lilly Homes, Inc., and R.H. Driscoll Development, Inc., recorded in Deed Book 5998 at Page 110 among the said land records; and (b) a Deed of Trust from Lilly Homes, Inc., and R.H. Driscoll recorded in Deed Book 5998 at Page 145 among those land records.

17. Chopp read this information, but did not notice any inconsistency or call for any further information to explain why only one party was listed as owner in the "vesting clause" of the binder, but two parties were listed as Grantors on Deeds of Trust recorded immediately after the Deed conveying the property to the owner.

18. Relying on the information in the "vesting clause" of the title insurance binder, Chopp prepared the General Warranty Deed listing Lilly Homes, Inc., as the only grantor of the conveyance of the property to Veronica Cahill.

19. Settlement of the sale to Cahill occurred on November 13, 1985. At settlement, Chopp charged $200 in attorney's fees to Cahill, and $200 in attorney's fees to Lilly Homes. In addition, Chopp charged a $100 fee to the seller for releases. In addition, Lilly Homes paid from the proceeds of settlement, real estate commissions to Town and Country Properties and Chain Bridge Realty.

20. Frederick Lilly signed the Deed on behalf of Lilly Homes. The Deed was taken to Margaret Ball to notarize. Margaret Ball was a legal secretary working for Philip Shalloway, an attorney who had done legal work for both Lilly Homes and Driscoll Development. Ms. Ball noticed the fact that Driscoll Development was not on the Deed and believed the signature of Driscoll Development was needed. Before the Deed was recorded, Ms. Ball alerted an employee of U.S. Titles of this fact. She also called the office of Joseph Chopp to alert him. She called and left a message with Chopp's office and received a return phone call from Chopp during which she informed him of the problem within a day of settlement.

21. The Deed was recorded by U.S. Titles on November 15, 1985, at 8:43 a.m., without any correction or change being made. Proceeds of the sale were disbursed to Lilly Homes following settlement in the

amount of $22,456.39, representing the amount due to Lilly Homes on the sale after payment of sales commissions and, settlement costs, and payoffs of the loans secured by the property. In addition to this, Lilly Homes had a $5,000 deposit from Veronica Cahill. Thus, the total amount realized by Lilly Homes, Inc., from this sale was $27,456.39. Following settlement, Lilly Homes, Inc., expended several thousand dollars on warranty work on the home.

22. In late 1985, and early 1986, Lilly Homes built a home on Lot 6, Sugar Mill Meadow. Lilly Homes designed, built, marketed, and sold the home without any contribution, financial or otherwise, from Driscoll Development. The home was sold in early 1986, to Ronald and Nadine Lazarus. Frederick Lilly signed the contract on behalf of Lilly Homes.

23. A title search done in connection with the sale of this property uncovered the interest of Driscoll Development. Driscoll Development was asked to sign a Deed conveying this property to the purchasers, but refused to do so unless it was indemnified against any claims of payments for labor and materials for constructing the home, and against any and all claims for damage to the property due to casualty or work related injury. Such an agreement was prepared and signed by Lilly Homes and by Richard Driscoll on behalf of Driscoll Development. Driscoll Development also signed the Deed to this property without receiving any payment, and without demanding or claiming the right to payment of any amount from Lilly Homes.

24. Some time in late 1988, or early 1989, Veronica Cahill contracted to sell the home. Ms. Cahill had not been informed of the title problem at the time that she sold the home. She discovered the problem after learning the results of a title search, which was done in connection with the sale of the home.

25. After Ms. Cahill contracted to sell the home, efforts to resolve the title problem escalated, and in March of 1989, Jean Printz of U.S. Titles, met with Richard Driscoll to attempt to get his signature on the Deed. Mr. Driscoll claimed he would not sign the Deed until certain sums of money were paid to him, allegedly based on debts of Lilly Homes or the joint venture to Driscoll Development.

26. Following the meeting, demand was made by Driscoll Development for $250,000, to sign a Deed to the property. Driscoll Development eventually agreed to sign a Deed to the property in exchange for payment of $100,000. $30,000 of this amount was paid by Joseph Chopp, $30,000 of this amount was paid by U.S. Titles, and $40,000 of this amount was paid by Meridian Title Insurance Company.

27. Richard Driscoll was aware in November of 1985 that Lot 14, Sugar Mill Meadow had sold. He had driven by the property in that time period and he had seen a "sold" sign. Yet, Driscoll Development made no demand for payment of what it alleges were amounts owed to it from Lilly Homes until after it became clear that the Deed had been recorded without Driscoll Development's signature, and that its signature was needed promptly to clear the title to Lot 14, Sugar Mill Meadow, and to avoid disrupting Veronica Cahill's sale.

### Conclusions Of Law

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

Plaintiff's first claim against Lilly and Lilly Homes is for fraud based on alleged misrepresentations regarding title to the property at issue.

In order to prevail on a claim of fraud, a plaintiff must show (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. The plaintiff must prove each of these elements by clear and convincing evidence. *Winn v. Aleda Construction Co.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984).

In addition, in order to prove reliance, the plaintiff must demonstrate that its reliance upon the representation was reasonable and justified. A party cannot claim to have reasonably relied upon a representa-

tion when: (a) that party makes a full and independent investigation and acts upon information so obtained; or (b) makes a partial inquiry, with full opportunity of complete investigation, and elects not to exhaust the readily available sources of information, but to act upon the knowledge obtained from his partial inquiry. *Masche v. Nichols*, 51 S.E.2d 144, 148, 188 Va. 857 (1949).

■ Thus, even though a real estate purchaser receives a positive representation of material fact, when he undertakes an examination of the facts for himself, he is charged with all the knowledge which he might have obtained had he pursued the inquiry diligently to the end. *Poe v. Voss*, 86 S.E.2d 47, 50, 196 Va. 821 (1955). In such circumstances, the buyer cannot complain that he was misled by the seller's misrepresentation, however, false it might have been, because he was no longer justified in relying upon it. *Watson v. Avon St. Business Center, Inc.*, 226 Va. 614, 311 S.E.2d 795, 799 (1984).

■ In this case, the evidence shows that U.S. Titles was hired by Cahill's attorney and acted as Meridian's agent in searching the title and preparing the title insurance binder. U.S. Titles made a thorough investigation and in fact knew the true status of the title from its independent search. Its knowledge of this fact is imputed to its principal, Meridian. Thus, although Meridian attempted to set forth evidence of fraudulent conduct on the part of the defendants, neither Meridian nor Cahill were justified in relying on any misrepresentations defendants may have made. As Meridian cannot prove reasonable and justified reliance, either in its own right or as subrogee, its fraud claim cannot stand.

■ Meridian's claim for breach of warranty is one of subrogation for breach of the general warranty of title conveyed to Cahill through her deed with Lilly Homes. Meridian contends that as subrogee, it is entitled to recover the money it paid to perfect Cahill's title.

■ Subrogation is the substitution of another person in the place of the creditor to whose rights he succeeds in relation to the debt. *Federal Land Bank of Baltimore v. Joynes*, 179 Va. 394, 18 S.E.2d 917, 920 (1942). The purpose of subrogation is to ensure that when one is more fundamentally liable for a debt which another is obligated to pay, that person cannot enrich himself by escaping his obligation. *Id.*

■ Although Virginia has long been committed to the liberal application of the principle of subrogation, recovery is not a matter of absolute right but is granted or withheld as the equities of a particular case may require. *See Thompson v. Miller*, 195 Va. 513, 79 S.E.2d 643, 647 (1954), *Federal Land Bank of Baltimore*, 18 S.E.2d at 920. Thus, the negligence of the party seeking subrogation is a factor that can be considered by the court in determining whether or not subrogation should be allowed. Such consideration is especially vital where, as here, there are subsequently intervening rights involved which would be prejudiced if subrogation were allowed. *Id.*

In this case, U.S. Titles made a critical error in transferring information learned in its title search. U.S. Titles was clearly negligent and Meridian, as principal, is responsible for that negligence. But for the error, no claim by Meridian or Cahill would exist against the defendants. In light of these circumstances, it would be contrary to principles of equity to allow Meridian to escape its obligation on the insurance policy it issued. The court will not allow a party to recover for a debt they themselves are fully responsible for merely because they can point to wrongful conduct on the part of another that was a separate and additional, but ultimately not contributing cause of the mistake creating the debt.

For those reasons, Plaintiff's breach of warranty claim must be dismissed.