**Bruce E. LUDWICK, Plaintiff,**

v.

**PREMIER BANK NORTH, INC.,
and Premier Bankshares
Corp., Defendants.**

**Civil Action No. 95–189–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

July 29, 1996.

Edward Gaines Stout, Jr., Bressler, Curcio & Stout, Bristol, VA, for plaintiff.

Paul G. Klockenbrink, William Raymond Rakes, Gentry, Locke, Rakes & Moore, Roanoke, VA, for defendants.

## MEMORANDUM OPINION

TURK, District Judge.

BRUCE E. LUDWICK brings this cause of action against his former employer, Premier Bank North, Inc. ("Premier North"), and Premier's holding company, Premier Bankshares Corp. ("Premier Bankshares"), alleging wrongful termination in violation of Virginia's public policy, and fraud. The action was originated in this court by Ludwick, a West Virginia citizen, against the corporations which are Virginia citizens, and the amount in controversy exceeds $50,000. Accordingly, the court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332.

The matter presently comes before the court on the defendants' Motion for Summary Judgment. Premier North and Premier Bankshares both maintain that Ludwick cannot make out a prima facie case for wrongful termination because the plaintiff has not stated what specific Virginia public policy was violated. Defendants also assert that Ludwick has not come forward with clear and convincing evidence necessary to prove fraud. For his part, Ludwick believes he has stated Virginia's strong public policy in favor of banking regulation, and that he adequately connected the defendants' alleged misstatements with the unwanted conclusion of his position as CEO for Premier Bank. The court finds that summary judgment must be granted to the defendants on both claims.

### I.

Premier North is a wholly owned subsidiary of Premier Bankshares with its headquarters in Clintwood, Virginia. Premier Bankshares also operates at least thirty other bank offices throughout Southwest Virginia including Premier Bank–Central, Inc. ("Premier Central"). Premier North and Premier Central were merged on January 1, 1996.

Bruce E. Ludwick has been employed in various capacities within the banking industry for several years. In the spring of 1995, immediately prior to his employment with Premier North, the plaintiff was working as a temporary loan review manager for First Federal Savings Bank of Western Maryland ("First Federal"). Although no offer of permanent status was ever given, Ludwick was in the process of discussing that matter with First Federal. At that point Ludwick was living with his family in Keyser, West Virginia.

Plaintiff first interviewed for the position as Premier North's CEO during the fall of 1994. Earlier that year, Premier Bankshares entered into an agreement to purchase Dickenson–Buchanan Bank, the entity which became Premier North. At that time however, the position was offered to, and accepted by, Gaines Sutherland, the former Dickenson–Buchanan Bank Executive Vice-President. After several months, the board members of Premier North and Premier Bankshares met and decided that they were unsatisfied with Sutherland's performance. On March 20, 1995 James R. Wheeling, Premier Bankshares' President and CEO, called Ludwick and asked him if he was still interested in the President's post at Premier North.

Ludwick indicated that he was indeed still interested and he interviewed with the executive committee of Premier Bankshares the next day. At some point before, or perhaps the day after the formal meeting with the executive committee, Ludwick met personally with Wheeling. The plaintiff admits to being informed by Wheeling that Sutherland was being demoted to Vice–President due to some performance problems. Ludwick also admits that he was told the bank had some loan administration problems, "like missing financial statements and things like that." (Ludwick Deposition, 102). In fact, Plaintiff felt that he was an excellent candidate for the position specifically because he has a penchant for working through loan administration debacles. Ludwick also inquired about the possibility of securing a written employment contract. The plaintiff was concerned about Sutherland's hasty demotion, the financial difficulties faced by the bank, and the fact that he would incur significant expense moving his family to Clintwood, Virginia. Ludwick testified during his deposition that his question regarding the necessity of a written contract, "meant, is the bank

under some kind of formal agreement, or a cease and desist order, or does it have any kind of action like that on it." (Ludwick Deposition, 102). Wheeling truthfully told Ludwick that nothing of the kind had ever happened. Plaintiff was also informed that under no circumstances would he receive a definite term employment contract—Premier Bankshares simply did not write such contracts for its subsidiary bank executives.

Plaintiff accepted the offer of employment at will as President and CEO of Premier North on March 22, 1995. Wheeling sent Ludwick a letter confirming the employment offer and acceptance. That letter contained salary and benefit provisions as well as reimbursement for moving expenses. It contained no promise of any definite employment term. The plaintiff may well have hoped to be Premier North's President for at least two years and indicated that desire to Wheeling, but no agreement of that kind was ever given by a Premier North or Premier Bankshares executive.

In early April, 1995, shortly before Ludwick assumed his executive position at Premier North, Premier Bankshares was notified of a possible defalcation. The state examiners conducting the investigation indicated that there were various transactions, initiated by Sutherland, the now demoted ex-President, which appeared to constitute a misappropriation of bank funds and diversion of same for personal gain. Premier Bankshares initiated their own investigation through auditing company Persinger & Co.

When Ludwick began his employment a few days later, he was told more about the Sutherland difficulties including the independent audit undertaking. Plaintiff took it upon himself, as one of his first orders of business, to file criminal referral forms about the matter with the FBI, the Federal Reserve, and the Virginia Attorney General's Office. Ludwick readily admits that nobody at the bank criticized him directly or indirectly for filing the criminal referrals. Aside from the defalcation, the plaintiff's primary duties included addressing several ongoing merger matters and cleaning up the bank's loan administration difficulties.

As a part of his loan and funds oversight responsibility, the plaintiff encountered some friction from various Premier Bankshares executives and board members. At his deposition, Ludwick outlined several points of contention. The first involved a certificate of deposit issued to a customer of the bank as a part of the Sutherland defalcation. Ludwick felt that if the CD was presented to the bank it should be honored, Wheeling disagreed. The CD was never presented to Premier North however, so no real problem ever materialized. A second problem involved what Ludwick termed, "the Mountain Ford property in Clintwood." Premier Bankshares executives wanted to sell the property to a developer for the construction of a Rite–Aid pharmacy. Contamination was discovered on the property from oil tanks and Ludwick took a different view from Premier Bankshares board officers of how to properly handle the concern. The plaintiff wanted to engage in a complete clean-up of the site before it was sold; Greg Baker, the holding company's Chairman of the Board, wanted to look into obtaining a waiver. Ludwick went ahead and told the developer to find another property.

Lastly, Ludwick has testified that there was one general problem with loan administration and a related personal difficulty involving Baker. The plaintiff wanted to hire a senior lending officer and operations officer because of the vast administration and regulatory problems he felt Premier North was facing. Ludwick also wanted to institute a policy of conducting much more detailed credit applications before loans were approved. Premier Bankshares felt that the additional positions were unnecessary and that in-depth credit investigations might cause dissatisfaction with long standing customers. Specifically with regard to Baker, Ludwick informed the board chairman that he could not use his holding company stock as collateral for a loan. Again, the plaintiff can point to no negative comments received or adverse ramifications which resulted from his disagreement with Baker.

In June, 1995 Premier Bankshares decided to merge Premier Bank North with Premier Bank Central and informed Ludwick that his

position would terminate on December 31, 1995. Both Ludwick, and Kenneth Hart, who had been Premier Central's President since the late 1970s, would be offered senior Vice–President posts at the newly merged entity. The banks would merge effective January 1, 1996 and the new President would be Mr. Lively, the former chief administrative officer for Premier Bankshares and the interim President of Premier North between Sutherland and Ludwick. Ludwick was told about the new conditions of his employment—the senior Vice–President position, a cut in salary, and his retention as President of Premier North until the merger became effective.

Although it was made clear to Ludwick that he was wanted for the new post, he was disappointed with the merger for several reasons. First, he had just moved his family to Clintwood, Virginia and now would have to up-root once again and move to Honaker, Virginia. Additionally, he was not pleased with the pay cut, nor the loss of his title. Due to his disappointment, Ludwick resigned on July 6, 1995, effective July 11, 1995. Certain conditions were attached to his resignation, but they were never accepted by Premier Bankshares.

## II.

■ Federal Rule of Civil Procedure 56 states that summary judgment should only be granted when "there is no general issue as to any material fact." The defendants' burden as moving parties is pointing to the absence of any material factual issues and establish their entitlement to summary judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, any doubt pertaining to the existence of a material fact must be resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Premier North and Premier Bankshares have met their burden as moving parties by establishing that Ludwick cannot prove a material element of each of his claims. Plaintiff simply has not stated any Virginia public policy which the defendants violated, nor shown any causal connection between the alleged omissions made by the defendants and the conclusion of his employment.

■ When a moving party has carried its burden, the opponent, "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Rules require that Ludwick resurrect a genuine issue of fact for trial. Fed.R.Civ.P. 56(e).[1] Plaintiff

1. In determining the circumstances of Ludwick's departure from Premier North, the court must take into account objections filed by the defendants relating to certain possible discrepancies between the March 11, 1996 sworn deposition testimony of Bruce E. Ludwick, and an affidavit in opposition to the summary judgment motion filed on July 17, 1996. The defendants assert that Ludwick never claimed before July 17, 1996 that he was discharged. Instead, it had always been understood that he resigned. At his deposition, Ludwick clearly stated that he tendered his resignation and that his last day of work was July 11, 1995. (Ludwick Deposition, 87). However, Ludwick stated in his lately filed affidavit that he believes he was terminated because Premier Bankshares never accepted the conditions of his resignation.

It is well recognized that a party may not oppose summary judgment simply by submitting an affidavit which is in conflict with prior deposition testimony. *Barwick v. Celotex Corp.,* 736 F.2d 946 (4th Cir.1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *see also, Rohrbough v. Wyeth Lab., Inc.,* 916 F.2d 970 (4th Cir.1990). The court is inclined to agree with the defendants that Ludwick has previously indicated that he resigned from his position and as such, cannot prove he was wrongfully terminated. Constructive discharge has never been recognized by the Virginia Supreme Court as a valid underpinning for a wrongful termination claim and this court must decide a diversity case based on law clearly established by statute or the state's high court. *See Spencer v. General Elec. Co.,* 894 F.2d 651, 657 (4th Cir.1990) (federal courts should use extreme care before recognizing a cause of action beyond that which has been clearly delineated by the state's highest court). However, even if Ludwick was given the benefit of the factual issue raised in his affidavit, he still could not survive summary judgment. Ludwick simply has not pointed to a specific statutory embodiment of Virginia's public policy, an essential element of a wrongful termination suit.

maintains that although he was told by Wheeling that no such concerns existed, he was faced with vast regulatory and loan administration problems during his short tenure as CEO of Premier North. However, although what Ludwick was told by Wheeling and whether the plaintiff ever suffered adverse consequences from his run-ins with various Premier Bankshares officers are cauldrons for brewing disputes between the parties, neither is at all relevant to this court's decision. In order to avoid summary judgment the disputed facts must be material to resolving the case, and the quality and quantity of the evidence offered to create such factual questions must be adequate to support a jury verdict. *See Thompson Everett, Inc. v. National Cable Advertising,* 57 F.3d 1317, 1323 (4th Cir.1995). Ludwick has not come forward with evidence that might lead any reasonable jury to find in his favor, and summary judgment must be granted for the defendants.

### III.

■ The Commonwealth of Virginia still strongly adheres to the common law employment at will doctrine. Absent an employment contract, notions of fundamental fairness dictate that both the employee and employer are at liberty to sever the relationship at any time, upon giving reasonable notice. *See Lockhart v. Commonwealth Educ. Sys.,* 247 Va. 98, 439 S.E.2d 328, 330 (1994). It is undisputed that Ludwick was an employee at will. He even inquired about an employment contract and was told that pressing the point would be extremely detrimental to his prospects with Premier Bankshares.

The employee at will rule is not absolute however, and certain very narrow exceptions have been recognized by the Virginia Supreme Court ever since *Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797 (1985). In *Bowman,* at will employees and common stockholders in the bank were allegedly fired because they failed to vote in favor of the bank's proposed merger. The court held that the alleged discharges violated the Commonwealth's public policy which secures a stockholder's voting rights as stated by former Code § 13.1–32. *See id.* 331 S.E.2d at 801. Similarly, in *Lockhart,* the Virginia high court found that employee termination due to race or gender violated the public policy against discrimination contained in the Virginia Human Rights Act, Code § 2.1–715. 439 S.E.2d 328.

The Virginia Supreme Court has been reluctant to extend this exception beyond its narrow terms as originally recognized in *Bowman.* In *Miller v. SEVAMP, Inc.,* a plaintiff could only find an expression of her right to "file grievances and to testify freely before grievance review panels" in an employee handbook. 234 Va. 462, 362 S.E.2d 915, 919 (1987). Her suit was rejected out of hand because her suit only impinged upon the private rights established between an employer and employee. *Id.* That ruling was recently expanded by *Lawrence Chrysler Plymouth Corp. v. Brooks,* 251 Va. 94, 465 S.E.2d 806 (1996). In that case Brooks asserted that he was wrongfully terminated after refusing to perform unsafe repairs on a car. *Id.* 465 S.E.2d at 807. Brooks claimed that his employer contravened the Automobile Salvage laws, Code § 46.2–1600, *et seq.,* and common law duties of the dealership. *Id.* at 809. The court flatly rejected the plaintiff's claim stating, "Unlike the plaintiffs in *Bowman* and *Lockhart,* brooks does not have a cause of action for wrongful discharge because he is unable to identify any Virginia statute establishing a public policy that Lawrence Chrysler violated." *Id.*

■ Ludwick's situation is virtually indistinguishable from Brooks'. The plaintiff in this case cites the "strong public policy in both Virginia and federal law with the goal of eliminating irregularities in banking institu-

---

Ludwick's resignation would also preclude a fraud claim. In order to establish fraud, Ludwick would have to show he was damaged in some way by the defendants' alleged misstatements and concealments. Plaintiff's resignation from his position would certainly preclude any possible showing of injury since it was his own action which terminated his employment. However, again the matter is not necessary to the court's decision, because even if Plaintiff was constructively or actually terminated, he cannot establish several material elements of a fraud claim by clear and convincing evidence.

tions," as the bulwark of his claim. *See* Complaint, ¶ 20. When pressed for a specific statutory embodiment of this policy, Ludwick only cites the multiple party accounts section of Virginia's banking and finance regulations. Va.Code § 6.1–125, *et seq.* Those sections, while they may protect certain numismatic expectations, are not the sort of narrowly defined scheme the Virginia Supreme Court had in mind when it recognized the tort of wrongful termination. Unlike the Virginia Human Rights Act, and the integrity of stockholder rights protected in *Bowman,* multiple party account regulation does not apply to Ludwick as a member of a narrowly defined class of protected individuals. Thus, Ludwick's wrongful termination claim, based on such broad statutory language, is exactly what the state of Virginia has already held invalid. *See Weaver v. Coca–Cola Bottling Co.,* 805 F.Supp. 10, 11 (W.D.Va.1992) (the public policy exception is only triggered when an employee is discharged in clear contravention of a specific statute designed to protect the public interest).

## IV.

Nor has Ludwick stated a prima facie case for fraud. In order to establish fraud in Virginia, a plaintiff bears the burden of proving by clear and convincing evidence: 1) a false representation, 2) of a material fact, 3) made intentionally and knowingly, 4) with intent to mislead, 5) reliance by the aggrieved party, and 6) resulting damages. *Bryant v. Peckinpaugh,* 241 Va. 172, 400 S.E.2d 201, 203 (1991). Plaintiff essentially claims that he was misled by what Wheeling failed to disclose regarding the bank's allegedly vast regulatory problems. Concealment of such material facts could, under the proper circumstances, constitute fraud especially in light of Ludwick's stated concerns to Wheeling at their pre-employment meetings regarding the expense of moving his family. *See Van Deusen v. Snead,* 247 Va. 324, 441 S.E.2d 207, 209 (1994) (concealment of a material fact in the face of specific inquiries can establish fraud). However, in order to prevail, Ludwick would have to show by clear and convincing evidence that Wheeling made an affirmatively false representation and that Plaintiff relied upon that to his detriment.

*See Jefferson Standard Life Ins. Co. v. Hedrick,* 181 Va. 824, 27 S.E.2d 198, 202 (1943).

In order to avoid an adverse judgment as a matter of law, Ludwick must do more than state conclusory allegations, he must raise the possibility that he might prevail before a reasonable jury considering the case in light of a fraud claim's heightened evidentiary burden. *See Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. The plaintiff admits he was familiar with some of the bank's problems, including the difficulties which had arisen because of Sutherland's actions. Ludwick also admits that he received truthful answers when he inquired about receiving an employment contract. He was concerned about a cease and desist order or some other onus on the bank imposed from the outside, not internal loan compliance or administration problems, because he was "good" at fixing those. (Ludwick Deposition, 102). The Supreme Court of Virginia has already stated that sketchy, vague, and internally inconsistent evidence presented in opposition to the false representation element of a fraud claim cannot meet the clear and convincing proof standard as a matter of law. *See Evaluation Research Corp. v. Alequin,* 247 Va. 143, 439 S.E.2d 387 (1994). Accordingly, based on the evidence presented in opposition to the summary judgment motion, the court concludes that Ludwick failed to clearly and convincingly establish that he was ever materially misled by Wheeling or any other of the defendants' officers.

Moreover, Ludwick was well aware of the Premier North's difficulties and should have known he was facing an uphill battle to clean up after Sutherland. Despite that knowledge, he only asked Wheeling a few questions about an employment contract and accepted the President slot the next day. In the real estate context Virginia has long held that a party may not be put on notice of a possible problem then sit back, do nothing, and claim reasonable reliance on the seller's allegedly material misstatements. *Poe v. Voss,* 196 Va. 821, 86 S.E.2d 47, 50 (1955). On the contrary, the claimant must take what he knows and act upon it as would a reason-

ably prudent man under the circumstances. *See Watson v. Avon Street Business Ctr., Inc.*, 226 Va. 614, 311 S.E.2d 795, 799 (1984). Further, the same principle, while it has not found specific expression in the employment context, has been applied outside the realm of real estate transactions. In *Harris v. Dunham,* the Virginia Supreme Court held that an experienced stock purchaser could not claim fraud based on a broker's alleged material misstatements. 203 Va. 760, 127 S.E.2d 65 (1962). Dunham was an experienced businessman who conducted a partial investigation into his target venture and then relied on certain statements by brokers regarding rebates, expected profits, and other related matters. *Id.* 127 S.E.2d at 69–70. Even after accepting that misstatements were made, the court found that Dunham was, "nonetheless, by virtue of the fact that he investigated partially, bound by all that a complete investigation would have disclosed." *Id.* at 71.

Although raised on a slightly different ground, Ludwick cannot readily distinguish his case from above cited real estate and stock purchase disputes. Like Dunham, Ludwick was an experienced banking executive and he well knew that Premier North was a problematic entity. Wheeling told him about Sutherland and about various other problems. Additionally, Plaintiff asked about an employment contract, but then ceased his investigation about the bank's problems when he was told that a fixed term agreement would not be well received by Premier Bankshares. In light of the partial inquiry made by Ludwick and the opportunity he had to further investigate the alleged regulatory problems, the plaintiff is not entitled to claim reasonable reliance on Wheeling's representations. *See Masche v. Nichols,* 188 Va. 857, 51 S.E.2d 144, 148 (1949); *see also Meridian Title Ins. Co. v. Lilly Homes, Inc.,* 735 F.Supp. 182 (E.D.Va.1990), *aff'd,* 934 F.2d 319 (4th Cir.1991). He was essentially put on notice and cannot now claim ignorance based on his own investigatory laziness.

However, even if Ludwick did show Wheeling told him material falsehoods, the plaintiff can prove no damages proximately resulted from the alleged material omissions. Disaf-fected former employees have prevailed in Virginia on fraud claims in the past, however the material misstatements alleged by those claimants related directly to some promised employment term. *See e.g., Sea–Land Serv. v. O'Neal,* 224 Va. 343, 297 S.E.2d 647 (1982); *Nargi v. CaMac Corp.,* 820 F.Supp. 253 (W.D.Va.1992). In this case, Wheeling never promised the plaintiff that he would enjoy any definite period of employment, nor that Premier Bankshares member banks would never merge. Indeed, Ludwick asked for an employment contract and was told one would not be given. Additionally, Ludwick stayed with Premier North long after he discovered the alleged regulatory problems. Further, the bank's regulatory and loan administration difficulties did not, in any way, lead to his "conditional" resignation and the plaintiff even desperately desired to continue as president of the newly merged bank. With that in mind, Ludwick cannot show any causal connection between the alleged misstatements and any damage he may have suffered.

### V.

For the reasons stated above, both Ludwick's wrongful termination and fraud claims must fail. Ludwick has not come forth with sufficient evidence to meet his burden in opposition to the defendants' Motion and summary judgment must be granted to the defendants as a matter of law.