**BANK OF MONTREAL, Plaintiff–Appellee,**

v.

**SIGNET BANK, Defendant–Appellant.**

**Bank of Montreal, Plaintiff–Appellant,**

v.

**Signet Bank, Defendant–Appellee.**

**Nos. 98–1659, 98–1749.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 25, 1999.

Decided Oct. 6, 1999.

tice" to Mr. Baker that he was required to arbitrate his ADA claim. *See Rosenberg,* 170 F.3d at 20.

**ARGUED:** Murray Hardison Wright, Wright, Robinson, Osthimer & Tatum, Richmond, Virginia, for Appellant. Greg A. Danilow, Weil, Gotshal & Manges, L.L.P., New York, New York, for Appellee. **ON BRIEF:** Jonathan S. Geldhzahler, Paul D. Anders, Wright, Robinson, Osthimer & Tatum, Richmond, Virginia, for Appellant. Harris J. Yale, Daniel S. Cahill, Weil, Gotshal & Manges, L.L.P., New York, New York; James L. Chapman, IV, Crenshaw, Ware & Martin, P.L.C., Norfolk, Virginia, for Appellee.

Before WIDENER, MURNAGHAN, and HAMILTON, Circuit Judges.

Vacated and remanded by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WIDENER and Judge HAMILTON joined.

## OPINION

MURNAGHAN, Circuit Judge:

Defendant Signet Bank ("Signet") appeals various rulings occurring during and after a trial in which the jury awarded the Plaintiff Bank of Montreal ("BMO") damages for fraud in the inducement of BMO's purchase of a non-recourse participation in a Signet credit facility. BMO cross-appeals from the grant of summary judgment against and dismissal of several of its claims. We affirm the district court's decision to dismiss the constructive fraud claim, the breach of contract claim, and several theories of fraud by omission. We also affirm most of the district court's evidentiary rulings. We hold, however, that the district court incorrectly allowed one theory of fraud to go forward, incorrectly instructed the jury on the scienter required for a concealment claim under Virginia law, and incorrectly denied admission of a key piece of evidence for Signet. Therefore, we vacate the judgment and remand for a new trial consistent with this opinion.

I.

This case is another case arising from the fraudulent loan scheme orchestrated by Edward J. Reiners ("Reiners"). *See Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614 (4th Cir.1999); *Corestates Bank v. Signet Bank,* Civ. No. 96–3199 (filed Apr. 23, 1996), 1997 WL 117010 (E.D.Pa. March 13, 1997) and 1996 WL 482909 (E.D.Pa. Aug. 26, 1996); *In re Nelco Ltd.,* 210 B.R. 707 (Bankr.E.D.Va.1997); *United States v. Reiners,* 934 F.Supp. 721

(E.D.Va.1996). Reiners, posing as Chief Operations Officer for a fictitious "top-secret offshore project" supposedly conducted by Philip Morris Companies, Inc., known as "Project Star," convinced Signet to establish a credit facility in which several other banks eventually joined to loan hundreds of millions of dollars to Project Star. Eventually, Reiners' fraud was uncovered—Philip Morris was not involved in any way with Project Star and in fact there was no such project—and the banks involved in the Project Star credit facility lost large sums of money. Because Signet was a lead bank and arranged for the participation of several of the other banks, many of these banks have sued Signet. Although the facts behind Reiners' scheme have been described elsewhere, *see Hitachi Credit*, 166 F.3d at 619–623; *Reiners*, 934 F.Supp. at 721–22, they are repeated here insofar as they are relevant to the present appeal.

### A.

In the fall of 1993, Richard Nelson ("Nelson"), President of Nelco, Ltd., a computer leasing firm, contacted Signet about the possibility of providing financing for Project Star. Nelson told Connie Mooney ("Mooney") of Signet that Reiners had invited Nelco to arrange the leasing of computer equipment for Project Star. Nelson and Mooney were familiar with Reiners' name from prior deals in which Reiners had executed documents on behalf of Philip Morris for computer leasing transactions. Nelson repeated to Mooney the story that Reiners had told him—that Reiners was still employed with Philip Morris and that Project Star was a top-secret project being conducted off-shore by Philip Morris which required large amounts of computer equipment. The participation of Philip Morris was a vital component of the security for the loans.

Reiners required Signet to sign a confidentiality agreement before proceeding with the transaction. Under this agreement, Signet had to treat all information concerning Project Star as confidential. Furthermore, the confidentiality agreement effectively prohibited Signet from contacting anyone at Philip Morris but Reiners regarding Project Star.[1] Reiners told representatives of Signet that upon inquiry, Philip Morris would deny the existence of Project Star and would deny that Reiners was employed by Philip Morris.

In November of 1993 Reiners and Nelco entered into a computer leasing agreement (the "Master Lease"). At or near that same time, Signet extended the first of several large secured loans to Nelco so that Nelco could purchase the computer equipment required under the Master Lease (the "Credit Facility").

Apparently not satisfied with his initial fraudulent successes, Reiners began expanding the scope of Project Star. As a result, Nelco needed additional funding to meet Reiners' demands. Signet continued to meet the financing needs generated by Project Star. Eventually, Signet's exposure to Project Star became so high that it threatened to exceed external regulatory and Signet's own institutional limits on loans to one borrower. In order to maintain its status with regard to Project Star's financing, Signet began syndicating portions of the loans made under the Credit Facility in 1995. In March of that year, Signet contacted BMO about purchasing a participation. At the time, BMO was interested in expanding its business with Philip Morris.

On April 5, 1995, BMO executed a confidentiality agreement concerning Project Star (the "Confidentiality Agreement"), ostensibly with Philip Morris. Reiners required each potential participating bank to sign a confidentiality agreement before revealing Philip Morris as the lessee. BMO

---

**1.** An amendment to the agreement added one Alex Kazier as another authorized contact    person for Philip Morris.

representatives testified that BMO had no reservations about signing the Confidentiality Agreement and did not consider the Confidentiality Agreement to be an impediment to its assessment of the creditworthiness of Nelco or Philip Morris. The Confidentiality Agreement did prevent BMO from contacting officials at Philip Morris as part of BMO's due diligence process.

Pursuant to its agreement with Signet (the "Participation Agreement"), BMO agreed to conduct its own, independent due diligence. *See* Participation Agreement § 6. Signet provided all of the documents that BMO requested. On April 13, 1995, BMO met with Signet and Nelco in Richmond, Virginia as part of BMO's due diligence. BMO never asked to review Signet's credit file. BMO did not visit Nelco's offices or request to review the Nelco files. Aside from one phone call with Reiners, BMO's only verification of Reiners' authority in Philip Morris was via an incumbency certificate which BMO obtained.

The Participation Agreement purported to limit Signet's liability in several ways. The Participation Agreement stated that Signet was not responsible for the "legality, validity, enforceability, [or] genuineness ... of any document relating to any Participated Asset or any collateral for any Participated Asset." Participation Agreement § 7(d). Further, the Participation Agreement stated that Signet "shall incur no liability ... by acting upon any ... certificate or other instrument or writing believed by [Signet] to be genuine and signed or sent by the proper party." Participation Agreement § 7(e).

By the time the fraud was uncovered in March of 1996, BMO's total outstanding participation was $87.3 million. On June 26, 1997, BMO received approximately $63 million from the assets of Reiners recovered by the U.S. Attorney's office.

BMO sued Signet under a variety of legal theories. These claims revolve around several events and circumstances.

### B. *The Authorization Certificate and the Pickin' Parlor Notes*

On October 15, 1993, Nelson presented Mooney with an "Authorization Certificate" which purported to authorize Reiners to sign documents related to Project Star on behalf of Philip Morris. The evidence is disputed as to exactly why, but Mooney told Nelson that Signet would be unable to lend money to finance Project Star based on the Authorization Certificate.

BMO maintains that Mooney rejected the Authorization Certificate because she thought it was a forgery—she thought the signature of Mike Miles, Chairman and Chief Executive Officer of Philip Morris, on the Authorization Certificate did not match Miles' signature in Philip Morris' most recent annual report.

At trial, BMO produced the "Pickin' Parlor Notes." Shortly after Mooney received the Authorization Certificate, she and Nelson had a telephone conversation in which Mooney articulated her concerns. Nelson memorialized this conversation on a "Pickin' Parlor" note pad. Nelson testified that he took the Pickin' Parlor Notes either while he was on the phone with Mooney or soon after he got off. According to Nelson's Pickin' Parlor Notes, as interpreted by BMO, Mooney told him that the "Miles signature [on the Authorization Certificate] appears diff[erent] from [his] signature in the] Annual Rpt." (J.A. at 1496.) On Mooney's own copy of the Authorization Certificate, she had placed a question mark next to Miles' signature.

Mooney testified, though, that she had not compared Miles' signature on the Authorization Certificate with his signature in any Philip Morris annual report and had written the question mark because the Miles signature was informal and presumably not the manner in which he would sign official Philip Morris documents. Mooney maintained that she did not believe that the "Mike Miles" signature might be a forgery and testified that she

rejected the Authorization Certificate after discussing it with several of her colleagues. Mooney testified that Signet's legal counsel, Gaines Tavenner, advised her that he preferred a more formal incumbency certificate to the Authorization Certificate. Tavenner, who was still employed by Signet at the time of the trial, denied ever speaking to Mooney about the Authorization Certificate or recommending obtaining an incumbency certificate.

After Mooney rejected the Authorization Certificate, Nelson asked her to return the original certificate to him. Mooney returned not only the original, but also the copy on which she had written notes reflecting her concerns and questions, because in her mind the transaction "would probably die." (J.A. at 1005–06.) She did not retain a copy for the bank's files.

Reiners later provided Signet with a more formal Incumbency Certificate authorizing him to execute documents relating to the Master Lease on behalf of Philip Morris. Signet accepted this Incumbency Certificate as a basis for its financing of Project Star.

Mooney testified that until the fraud was discovered in March of 1996, she had forgotten about the Authorization Certificate. Mooney never told BMO about the existence of the Authorization Certificate or Signet's rejection of the Authorization Certificate.

When the fraud was discovered in March 1996, Mooney testified that she suddenly remembered the existence of the Authorization Certificate. She asked Nelson to retrieve the Authorization Certificate and gave it to the FBI agent investigating the fraud.

BMO presented evidence that under general practice in the banking industry Signet should have disclosed the rejection of the Authorization Certificate to loan participants. William Wallace, former Chief Operating Officer of the Federal Reserve Bank of Dallas, testified that "a possible forgery is the wors[t] kind of red flag

a banker could encounter." (J.A. at 1209.) In the context of Project Star, if there was "even the slightest hint that you're not dealing with someone who is authorized to sign for Philip Morris, then that pulls the rug out from under the whole basis for the loan." (J.A. at 1209.)

BMO's theory at trial was that Mooney intentionally buried the existence and rejection of the Authorization Certificate—purged the document from Signet's files, failed to discuss it with other Signet officials, and "forgot" about it even when faced with questions from other potential participating banks about Reiners' authority on behalf of Philip Morris. According to BMO, this nondisclosure amounted to fraudulent concealment.

## C. *Affirmative Misrepresentations*

During the course of BMO's review of Project Star, BMO presented some evidence that Signet, through Mooney, affirmatively represented to BMO that Reiners was an employee of Philip Morris authorized to act on behalf of Philip Morris. Because these affirmative representations actually turned out to be false, BMO based a claim of constructive fraud on them.

## D. *Failure to Disclose Bank of Nova Scotia Information*

In late December 1995 or early January 1996, the Bank of Nova Scotia ("BNS"), a potential participant in the Project Star Credit Facility, contacted the human resources department at Philip Morris and was told that Reiners was not employed there. On January 10, 1996, BNS believes it told someone at Signet who responded "something along the lines of, well, of course, that is what they are supposed to tell you. It's a top secret project." (J.A. at 936.) Mooney recalled being told that BNS had called Philip Morris headquarters and had been told that Reiners was not at that location. Subsequent to its discussions with BNS and to closing BMO's final participation, Signet provided an additional $9 million in funding for Pro-

ject Star. Signet presented evidence indicating that BNS continued to be interested in participating in loans to Project Star, and did not decline the transaction until after January 16, 1996, the date of BMO's final funding of Project Star. BNS ultimately chose not to participate in the Credit Facility. There was no direct evidence indicating the reason for this decision.

BMO's Tom Peer testified that before BMO made its final funding on January 16, 1996, Mooney told him that BNS did not proceed with the transaction because it could not agree to the terms of an assignment agreement with Signet. Mooney never told Peer that BNS had told her that Philip Morris denied that Reiners was a Philip Morris employee.

### E. *The WRE Letters and Evading FDA Regulations*

In late December 1995, Hitachi Credit America Corp., another bank involved in the Project Star Credit Facility requested for its files a letter about the corporate status of Worldwide Regional Exports ("WRE"), a shell entity ostensibly involved in Project Star. Nelson told Mooney that Reiners would write a letter stating that WRE was authorized by the U.S. Government and Philip Morris to conduct Project Star. Mooney told Nelson that reference to the government was confusing, misleading, and would lead to questions to which Mooney and Nelson did not know the answers. Because the government was not subsidizing the lease or providing Philip Morris with any funds, and because repayment of the loan was not in any way affected by government involvement, Mooney testified that she thought reference to the government was unnecessary. Reiners then wrote a letter without referring to the government and the letter was provided to Hitachi. Reiners had actually written a previous version of this letter mentioning the U.S. government, but Signet apparently did not discover that fact until after the fraud was revealed.[2] Signet never informed Hitachi or BMO that the government was involved in any way with Project Star.

Mooney was also informed at one point that Project Star was located offshore in part to evade Food and Drug Administration regulations on testing products on human beings. Signet never passed this information on to BMO.

### F. *Procedural History*

BMO's First Amended Complaint contained five causes of action: Count 1—Gross negligence; Count 2—Breach of express contract; Count 3—Negligent Misrepresentation/Constructive Fraud; Count 4—Frustration of Purpose; and Count 5—Fraud by omission. Counts 1 and 3 were dismissed outright by the district court. Count 4 was withdrawn by BMO. The district court granted summary judgment in favor of Signet on Count 2. Thus, the only claim left was Count 5—actual fraud in the inducement based on (a) Signet's concealment of its rejection of the Authorization Certificate, (b) Signet's concealment of the BNS information, (c) Signet's concealment of possible government involvement in Project Star, and (d) Signet's concealment that Project Star was located offshore to evade regulations on human testing. The district court only allowed the concealment theories advanced in (a) and (b) to go forward to trial.

At the end of trial, the jury returned a verdict for BMO in the amount of $15.5 million. After the verdict, Signet filed a renewed Rule 50 motion for judgment as a matter of law. Signet also moved for a new trial under Rule 59 on the theory that the amount of dam-ages awarded evi-

---

**2.** It is worth noting that the "facts" as elucidated at this trial do not quite match up to the "facts" as elucidated in *Hitachi Credit. See Hitachi Credit,* 166 F.3d at 621 (stating that Mooney initially received a copy of the Original WRE Letter). We note that some of the *Hitachi Credit* facts were taken from Hitachi's complaint, *see id.* at 620 n. 2, and feel constrained to follow the facts as elucidated at trial below.

denced juror confusion. These motions were denied.

Signet now appeals the denial of these motions. Signet argues that BMO's fraud claims were barred as a matter of law by the terms of the contract, because Signet was under no duty to disclose, and/or because reliance was unjustifiable. Signet also challenges various evidentiary decisions: the district court refused to allow Signet to admit the Participation Agreement; admitted the Pickin' Parlor Notes; admitted the evidence concerning the BNS contact with Philip Morris department of human resources; and admitted the evidence about the handling of the WRE letter.

Because we grant Signet some of the relief it seeks, we must consider BMO's conditional cross-appeals. BMO challenges the district court's decisions dismissing some of its claims and theories of liability: (1) the constructive fraud claim; (2) a fraud theory based on Signet's nondisclosure of government involvement; (3) a fraud theory based on Signet's nondisclosure that Project Star was located offshore to evade regulations on human testing; and (4) the breach of contract claim. BMO also challenges the district court's decision to deny admission altogether of evidence about Signet's knowledge with respect to evasion of the human testing regulations.

## II. *Fraud Claims*

Signet has mounted several attacks against the legal validity of BMO's claim for fraud by omission. Signet's motions to dismiss, for summary judgment, for a directed verdict, and for judgment as a matter of law based on these theories of legal insufficiency were denied. Since each of these claims rests upon identical questions, we address them here as one. We review each of these decisions *de novo*, viewing all evidence and drawing all reasonable inferences in the light most favorable to BMO. *See Mylan Laboratories, Inc. v. Matkari,*

7 F.3d 1130, 1134 (4th Cir.1993) (Rule 12(b)(6)); *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 163 (4th Cir.1992) (en banc) (summary judgment); *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.,* 87 F.3d 654, 656–57 (4th Cir. 1996) (Rule 50).

Additionally, BMO has challenged the district court's dismissal of its claim for constructive fraud. We review this dismissal *de novo*, viewing the allegations in the light most favorable to BMO. *See Matkari,* 7 F.3d at 1134.

### A. *Virginia Law*

■ The parties in this diversity case [3] agree that it is governed by Virginia law. *Cf. Hitachi Credit,* 166 F.3d at 628 (applying Virginia law to case arising from Project Star Credit Facility). A party pursuing a cause of action for fraud in Virginia must prove by clear and convincing evidence all of the elements of fraud: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance. *Van Deusen v. Snead,* 247 Va. 324, 441 S.E.2d 207, 209 (1994). Several cases indicate that affirmative misrepresentations made recklessly subject the speaker to liability for actual fraud under Virginia law. *See Cerriglio v. Pettit,* 113 Va. 533, 75 S.E. 303, 307 (1912); *Hitachi Credit,* 166 F.3d at 628 (citing *Bradley v. Tolson,* 117 Va. 467, 85 S.E. 466, 467 (1915)).

■ In addition to actual fraud, Virginia law provides a cause of action for constructive fraud:

A finding of constructive fraud requires proof that a false representation of a material fact was made, innocently or negligently, and that the injured party suffered damage as a result of his reliance on the misrepresentation. In addi-

---

3. Signet was a Virginia citizen at the outset of the case; BMO is a citizen of Canada.

tion, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that the person would act on this representation.

*Henderson v. Henderson,* 255 Va. 122, 495 S.E.2d 496, 499 (1998) (citations omitted).

■ Virginia also recognizes fraud by omission,. sometimes called "concealment." "Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 597 (1984). Silence does not constitute concealment in the absence of a duty to disclose. *Cf. Norris v. Mitchell,* 255 Va. 235, 495 S.E.2d 809, 812–813 (1998) (claim for fraud by concealment rejected, in part, because of holding that defendants had no duty to disclose); *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995) (applying New York law). According to a recent case from this Circuit applying Virginia law:

> concealment, whether by word or conduct, may be the equivalent of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth. *Van Deusen v. Snead,* 247 Va. 324, 441 S.E.2d 207, 209 (1994). Moreover, a party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud. *Id.*

*Hitachi Credit,* 166 F.3d at 629. Concealment of a material fact, "knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if the existence of the fact were expressly denied." *Metrocall of Delaware, Inc. v. Continental Cellular Corp.,* 246 Va. 365, 437 S.E.2d 189, 193 (1993). *See also* Restatement (Second) of Contracts § 160 (1979) ("Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist.") *quoted in Van Deu-*

*sen,* 441 S.E.2d at 210. As the above block-quote makes clear, unlike fraud for affirmative misrepresentations, concealment requires a showing of intent to conceal a material fact; reckless nondisclosure is not actionable. *See Norris v. Mitchell,* 495 S.E.2d at 812 ("Therefore, we have required either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact.").

■ In all cases of fraud the plaintiff must prove that it acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the assumption that the concealed fact does not exist). *See Metrocall,* 437 S.E.2d at 194; *Poe v. Voss,* 196 Va. 821, 86 S.E.2d 47, 50 (1955) (quoting *West End Real Estate Co. v. Claiborne,* 97 Va. 734, 34 S.E. 900, 906 (1900)); *Chandler v. Satchell,* 160 Va. 160, 168 S.E. 744, 749 (1933); *Meridian Title Ins. Co. v. Lilly Homes, Inc.,* 735 F.Supp. 182, 185 (E.D.Va.1990) (applying Virginia law), *aff'd,* 934 F.2d 319 (4th Cir.1991). *Cf. Tate v. Colony House Builders, Inc.,* 257 Va. 78, 508 S.E.2d 597, 599 (1999) (stating that person is not justified in relying upon statement of opinion); *Henderson v. Henderson,* 495 S.E.2d at 499 (false representation must be such as to induce a reasonable person to believe it).

■ A plaintiff who, after a misrepresentation has been made, undertakes a full investigation of the misrepresented information cannot claim justifiable reliance on the misrepresentation. Similarly, when a plaintiff "makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry," he cannot claim reliance. *Hitachi Credit,* 166 F.3d at 629 (citing *Harris v. Dunham,* 203 Va. 760, 127 S.E.2d 65, 71–72 (1962)). The rationale here is that the plaintiff did not actually rely upon the misrepresentation, but rather relied upon his own investigation into the matter, however incomplete. *See, e.g., Harris v. Dunham,* 127 S.E.2d at 70; *Poe v. Voss,* 86 S.E.2d at 50 (quoting *West End Real Estate Co.,* 34 S.E. at 906); *Masche*

*v. Nichols,* 188 Va. 857, 51 S.E.2d 144, 148 (1949).

■ When the one inducing the other to enter the contract throws the other off guard or diverts him from making the reasonable inquiries which usually would be made, however, Virginia law will forgive an incomplete investigation: "one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." *Nationwide Ins. Co. v. Patterson,* 229 Va. 627, 331 S.E.2d 490, 492 (1985). *See also Watson v. Avon St. Business Center, Inc.,* 226 Va. 614, 311 S.E.2d 795, 798–99 (1984); *Armentrout v. French,* 220 Va. 458, 258 S.E.2d 519, 524 (1979); *Horner v. Ahern,* 207 Va. 860, 153 S.E.2d 216, 219 (1967).[4] Now, to apply these principles to the case at bar.

### B. *Contractually Barred from Claiming Fraud*

Signet argues that, as a legal matter, BMO cannot pursue any of its claims for fraud because the Participation Agreement precludes recourse against Signet in the event of negligence or recklessness. Under § 7 of the Participation Agreement, Signet had no responsibility for any statements or representations made by Nelco, *see* Participation Agreement § 7(b), and made no warranties or representations about, and was not otherwise responsible for, the "legality, validity, enforceability, [or] genuineness ... of any document relating to any Participated Asset or any collateral for any Participated Asset," Participation Agreement § 7(d). (J.A. at 84.) Further, under § 7(e), Signet "shall incur no liability ... by acting upon any ... certificate or other instrument or writing

believed by [Signet] to be genuine and signed or sent by the proper party." (J.A. at 84.)

The district court rejected Signet's arguments as applied to BMO's claim for fraud by omission, but agreed with Signet as applied to BMO's claim for constructive fraud.

We must reject Signet's argument altogether.[5] First, as for the fraud by omission claims, BMO has necessarily alleged intentional fraud, *see infra.* Even Signet acknowledges that the Participation Agreement does not bar claims based on intentional conduct.

■ Nor does the Participation Agreement bar claims based on reckless or even innocent misrepresentations. "While ... contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a 'false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity' " or an action for damages in a court of law. *George Robberecht Seafood, Inc. v. Maitland Bros. Co.,* 220 Va. 109, 255 S.E.2d 682, 683 (1979) (quoting *Wilson v. Carpenter's Adm'r,* 91 Va. 183, 21 S.E. 243, 244 (1895)). *George Robberecht* is based on the rationale that the tort of fraud in the inducement precedes the contract, so a contractual waiver of liability is ineffective. *Id.* at 683 (waivers of warranties "stand[ ] no higher than the contract which is vitiated by the fraud." (quoting *Packard Norfolk v. Miller,* 198 Va. 557, 95 S.E.2d 207, 213 (1956))). Thus, the Participation Agreement does not as a matter of contract law bar a claim for fraud regardless of whether the fraud is based on intentional misrepresentations, reckless

4. Given that the Virginia courts have allowed the false representation to act as the "diversion", *see Van Deusen,* 441 S.E.2d at 210 (same acts of concealment serve as basis for both element of fraud and "diversion" exception to real property caveat emptor doctrine), the Virginia courts have effectively eliminated

the requirement that reliance be reasonable in some cases.

5. As discussed *infra* at section II(D), we affirm the district court's rejection of the constructive fraud claim on a different basis.

misrepresentations, or even innocent misrepresentations associated with a claim for constructive fraud. *See Hitachi Credit,* 166 F.3d at 630; *Packard Norfolk,* 95 S.E.2d at 210, 213 (allowing claim for constructive fraud in the inducement despite contractual disclaimers).

Merely because the fraud in the inducement makes the contract voidable, however, it does not make the contract terms irrelevant. Fraud in the inducement is a tort-based remedy; it is not grounded in contract law. The provisions of the Participation Agreement may affect the tort concepts of whether Signet had a duty to disclose and whether BMO's reliance was reasonable, as discussed below.

### C. *Signet's Duty to Disclose* [6]

Signet maintains that BMO cannot assert liability for nondisclosure of Signet's rejection of the Authorization Certificate because Signet was under no duty to make any disclosures.[7] Signet again relies upon § 7(b)-(e) of the Participation Agreement, *see supra* II(B).

■■■ As noted above, the failure to disclose information is generally not actionable as fraudulent concealment in the absence of some duty to disclose. *Cf. Norris v. Mitchell,* 495 S.E.2d at 812–813. A duty to disclose does not normally arise when parties are engaged in an arm's length transaction. *See Costello v. Larsen,* 182 Va. 567, 29 S.E.2d 856, 857 (1944); *Badger Pharmacal, Inc. v. Colgate–Palmolive Co.,* 1 F.3d 621, 627 (7th Cir.1993). A duty

may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist, *see Allen Realty Corp.,* 318 S.E.2d at 597; *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); or (2) if one party takes actions which divert the other party from making prudent investigations (e.g., by making a partial disclosure), *see Horner v. Ahern,* 153 S.E.2d at 219; *cf. Nationwide Ins. Co.,* 331 S.E.2d at 492–93 (defendant directed plaintiff to rely on its agents).[8]

■■■ We think that there was sufficient evidence for a jury to find that Signet had a duty to disclose its rejection of the Authorization Certificate.[9] A jury could have found that Signet had superior knowledge with respect to its own rejection of the Authorization Certificate and that BMO was reasonably acting on the assumption that Signet did not have any knowledge indicating that the underlying transaction was a sham. Further, a jury could have found that Signet represented to BMO that it had an affirmative belief that Reiners was authorized to act for Philip Morris. Such a partial disclosure of the facts would also create a duty if the jury found that Signet knew of the possibility of Reiners' fraud.

### D. *Reasonableness of Reliance*

Signet also argues that as a matter of law BMO could not claim reasonable reliance upon Signet's alleged misrepresenta-

---

**6.** This section applies only to BMO's claims for concealment. Even if there was no duty to disclose, Signet could still face liability for affirmative misrepresentations.

**7.** Signet's duty to disclose the BNS information, the information about government involvement, and the information about evasion of FDA regulations will be discussed separately.

**8.** Obviously, the concealment itself cannot constitute one of these diversionary actions—then there would always be a duty to disclose. *But cf. supra* n. 4.

**9.** We agree with the district court, though, that the Participation Agreement's provision that Signet "will furnish [BMO] with copies of . . . (iii) subject to any duty of confidentiality to which the Bank is subject, other relevant documents which the Bank shall receive from the Borrower in connection with any Participated Asset," Participation Agreement § 5(b), did not apply to the Authorization Certificate. This provision created only a prospective duty and did not impose a duty to disclose the prior rejection of the Authorization Certificate.

tions and concealment due to the disclaimers and duties in the Participation Agreement. As noted above, the Participation Agreement required BMO to undertake its own due diligence, Participation Agreement § 6, and included a number of disclaimers and waivers of liability concerning statements from Nelco and the genuineness of documents relating to the transaction, *see supra* II(B). Signet asserts that because of these provisions it would have been unreasonable for BMO to rely upon any representation or omission by Signet regarding the transaction.

There are two issues around which the reliance question revolves. First, whether reliance is justified depends upon whether BMO assumed a duty to investigate the facts it ultimately relied upon and whether BMO adequately carried out its duty to investigate. If BMO specifically disclaimed reliance on the very representation now asserted as fraudulent, reliance would be unreasonable. A general waiver would not suffice, however. *See Hitachi Credit*, 166 F.3d at 630–31; *Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir.1987); *George Robberecht Seafood*, 255 S.E.2d at 683. *See also Bank of the West v. Valley Nat. Bank of Ariz.*, 41 F.3d 471, 477–78 (9th Cir.1994); *Banco Totta e Acores v. Fleet Nat. Bank*, 768 F.Supp. 943, 949 (D.R.I. 1991); *Banque Arabe*, 57 F.3d at 155 ("since the participation agreement expressly recited that Banque Arabe would not rely on information from MNB," reliance is not justifiable). Second, reliance will be justified in any event if Signet threw BMO off guard or diverted BMO from learning the necessary facts.

### 1. *Constructive Fraud Claim*

■ We hold that Signet's disclaimers in the Participation Agreement made reliance by BMO unreasonable insofar as a constructive fraud claim is concerned. In *Hitachi Credit*, we found that contract disclaimers somewhat different than those at issue in this case did not specifically address the validity of the underlying transaction but only the financial condition of Nelco and Philip Morris. *See* 166 F.3d at 630–31. The Participation Agreement in this case, however, is significantly different than that involved in *Hitachi Credit*. Specifically, the Participation Agreement here provided that Signet was not responsible for the "genuineness" of any document relating to the Master Lease, which would include documents relating to Philip Morris' participation. Similarly, the disclaimers in the Participation Agreement are much broader than those in *Hitachi Credit*, going beyond financial information to any documents "relating to" the Master Lease. Finally, there was no equivalent to § 7(e) of the Participation Agreement in *Hitachi Credit*. Because of these significant differences, we think that the Participation Agreement made BMO's reliance on innocent or negligent misrepresentations made by Signet that merely restated information derived from Nelco and Reiners unjustifiable. *Cf. Corestates II*, at *4–5 (same holding, but based on language identical to that in *Hitachi Credit*).

We read the constructive fraud claim as a theory of liability based on an alternative view of the facts—that Signet was only negligent, and that it had made affirmative representations about Philip Morris' participation which turned out to be false.[10] Thus, this theory basically seeks to charge Signet with liability for its restatements of information received from Nelco and Reiners. For the reasons discussed above, reliance by BMO on such negligent misrepresentations was unjustifiable.[11]

---

**10.** As discussed *infra*, there is no liability for a negligent concealment.

**11.** We acknowledge that the facts arguably support a claim for actual fraud by reckless or intentional affirmative misrepresentation.

Such a claim is outside the scope of a claim for constructive fraud, however. Although a claim for fraud by reckless or intentional affirmative misrepresentation was evident in BMO's first amended complaint, *see* First

Even given the above, BMO's reliance could still be reasonable if Signet took BMO off its guard. In *Hitachi Credit* we held that via the confidentiality agreement Signet had prevented the plaintiff bank from carrying out an adequate investigation. *See* 166 F.3d at 630. In that case, however, the confidentiality agreement was apparently between Signet and Hitachi. *Id.* The only evidence of a confidentiality agreement in this case was between BMO and Reiners. Signet cannot be responsible for the effects of that agreement since it was not even a party to the agreement. *Cf. Corestates Bank I*, 1996 WL 482909 at *6 (Confidentiality agreement was roadblock imposed by Reiners, not Signet). Also, BMO knew that Signet had signed a similar confidentiality agreement with Reiners. So, because BMO knew Signet's due diligence was hampered in exactly the same way as BMO's, it would have been unreasonable to rely upon Signet's restatements of Nelco and Reiners' representations.

### 2. *Concealment Claim*

A different analysis applies to the Authorization Certificate concealment claim. In the Participation Agreement, a jury could find that BMO did not assume a duty to investigate whether, and did not disclaim reliance on the implied representation that, *see Metrocall*, 437 S.E.2d at 193, Signet had no reason to suspect a forgery. It would be reasonable for a jury to conclude that BMO's due diligence duty was merely to investigate the credit-worthiness of the transaction, not Signet's knowledge or recklessness as to whether the transaction was a sham. Also, even had BMO undertaken to investigate this issue, a jury could have found that because of Signet's actions—purging its files of all reference to the Authorization Certificate—BMO would have been unable to discover the fact that Signet rejected the Authorization Certificate.

### E. *Sufficiency of Evidence*

Signet has challenged the legal sufficiency of the evidence provided by BMO to establish Signet's fraud via a Fed. R.Civ.P. 50 motion for judgment as a matter of law. To prevail on this claim, Signet must show that the evidence presented supports only one reasonable conclusion as to the verdict. *Gairola v. Virginia Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir.1985).

Signet asserts several deficiencies. First, Signet argues that BMO did not produce evidence sufficient to establish that Signet knew the Authorization Certificate was, or was even reckless that it might have been, a forgery. Second, Signet argues that there was insufficient evidence for a jury to conclude that BMO actually relied upon Signet.

Signet has failed to meet its burden. BMO presented a theory that Mooney and Signet profited substantially from the Project Star lending. BMO provided ample evidence that Mooney actively concealed the rejection of the Authorization Certificate both within Signet and with outside banks. Also, there was evidence sufficient for a reasonable jury to conclude that BMO acted on the assumption that Signet had no reason to believe Project Star was a sham. Ultimately, Signet is raising disputed factual issues here, and such issues were properly for the jury to resolve.

### F. *The Bank of Nova Scotia Claim*

Signet argues that it is entitled to judgment as a matter of law on BMO's theory of fraud based on the conversation between the Bank of Nova Scotia ("BNS") and Signet. BNS representatives had called Philip Morris to confirm Reiners' status there and were told that Reiners no longer worked there. BNS passed this information on to Signet. BMO presented evidence that Signet told BMO that BNS did not proceed with the transaction because it could not agree to the terms of an

Amended Complaint paras. 78–80, 84–86, that

claim seems to have been dropped at trial.

assignment agreement, and that Signet never mentioned BNS' phone call to Philip Morris.

Signet argues that, even viewed in the light most favorable to BMO, this evidence does not support a finding that Signet willfully or even recklessly failed to disclose the contents of the BNS phone call to BMO. First, there is no evidence that BNS decided not to participate in Project Star because of this phone call. In fact, the only evidence is that BNS remained interested in Project Star well after it had made the phone call to Philip Morris. BNS witnesses testified that (1) BNS officials joked about the fact that Project Star was so top secret that the Philip Morris Human Resources Department denied that Reiners worked there, and (2) continued to assume that Project Star was legitimate. Second, Signet argues that its response to this phone call was not at all reckless and does not suggest an intentional concealment of a material fact. From the start, Signet and the other banks were under the belief that Philip Morris would deny that Reiners worked there. The information BNS gave Signet comported exactly with Signet's understanding of how the transaction would be treated by Philip Morris and did not indicate that a fraud was afoot.

■ We hold that the claim of concealment based on the above facts should have been dismissed. Fraud requires that the fact misrepresented or omitted be material. The fact that Philip Morris human resources representatives denied that Reiners worked at Philip Morris was not a material fact because that is precisely what everyone associated with Project Star was told that they would say. Further, it would be pure speculation to assume that BNS did not go forward with the Project Star loan because of the phone call with Philip Morris. Thus, the evidence does not support a claim that Signet affirmatively misrepresented the reason why BNS did not join the Project Star Credit Facility. Therefore, Signet was entitled to judgment as a matter of law on

that claim. On remand, therefore, the jury should be instructed that the BNS claim is not an independent source of liability.

G. *Dismissal of Fraud Theories Based on Omission of Information about Government Involvement and Evasion of Food & Drug Laws on Human Testing*

BMO asserts that the district court improperly prohibited BMO from pursuing a claim for fraud based on the theories that Signet concealed information (1) that Project Star was being conducted offshore, in part, to evade FDA regulations regarding testing on human beings, and (2) that the U.S. government was involved in Project Star.

■ It appears that the district court concluded that, as a matter of law, the information surrounding the WRE letters and the evasion of FDA regulations was not material to BMO's decision to fund Project Star. We affirm the district court's conclusions on these issues. Further, we hold that BMO's reliance on Signet's omission of these issues was unreasonable as a matter of law given that BMO had assumed a duty to conduct its own due diligence and was free to contact Reiners to discuss the details of Project Star. BMO had it within its power, even with the confidentiality agreement, to uncover this information relating to the transaction it was funding.

H. *Jury Instructions on Scienter*

■ Challenges to jury instructions are reviewed under an abuse of discretion standard. *Nelson v. Green Ford, Inc.*, 788 F.2d 205, 208 (4th Cir.1986). The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principles without misleading or confusing the jury. *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987).

Signet takes issue with the trial court's instruction to the jury on scienter. The district judge charged the jury that an omission is "knowingly and intentionally" made if the person:

(A) As a matter of conscious decision does not disclose the material fact; or

(B) Does not disclose the material fact because of a willful, reckless disregard of his duty to disclose....

(J.A. at 485.) Signet argues that Virginia law requires a knowing or intentional omission to prove actual fraud.

■ In *Hitachi Credit*, we observed that Virginia law allows an action for fraud "where misrepresentations are made ... with reckless abandon and disregard for the truth." *Hitachi Credit*, 166 F.3d at 628. *Hitachi Credit* also observed, however, that a claim for fraud by omission requires deliberate nondisclosure. *Id.* at 629. This observation is confirmed by the Supreme Court of Virginia, which requires "either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact" in a concealment claim. *Norris v. Mitchell*, 495 S.E.2d at 812. Because the only theories of fraud at trial involved concealment claims, the jury would have had to find that there was "a deliberate decision to conceal" the rejection of the Authorization Certificate. *See id.*

BMO argues that even if recklessness is insufficient, the district court's charge does not violate the *Spell* standard. First, in the section of the charge defining the elements of fraud, the district court instructed the jury that BMO had to prove that "Signet Bank knowingly or intentionally omitted to disclose the material fact." Second, the district court did not define "knowingly or intentionally" as mere recklessness. The court defined "knowingly or intentionally" as a "willful, reckless disregard" of the duty to disclose.

■ It is a close question, but we think the error was sufficient to require a new trial. First, the fact that the district court

initially instructed the jury properly does not take away from the fact that the district court's later instruction was improper. This observation is more forceful given that the erroneous instruction was more specific on the point than was the prior correct instruction. The maxim of statutory interpretation *generalibus specialia derogant* comports with common logic. Second, the addition of the word "willful" prior to reckless did not serve to save the instruction because it could only have confused the jury. This is especially so because the use of the disjunctive between the two subsections of the instructions indicates that there must be a difference between a "conscious decision" and a "willful, reckless disregard." The jury must have come to the conclusion that they could find Signet liable even if Signet's omission was merely reckless. Therefore, the district court's instruction did not adequately inform the jury of the controlling legal principles. *See Spell*, 824 F.2d at 1395.

### III. Evidentiary Rulings

■ We review the district court's evidentiary rulings for an abuse of discretion. *See Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1383 (4th Cir.1995).

#### A. Refusal to Allow Admission of the Participation Agreement

■ The district court believed that, because BMO's claim was only proceeding as a fraud in the inducement claim, the fraud vitiated the contract terms and the contract was therefore irrelevant. We find an abuse of discretion in the district court's refusal to allow Signet to admit into evidence the Participation Agreement.

One of Signet's chief defenses was that the terms of the Participation Agreement limited Signet's duty to disclose and precluded BMO from reasonably relying on Signet's representations or omissions. Although we have held that the Participation Agreement does not as a matter of law extinguish Signet's duty to disclose or pre-

clude BMO's reliance, that is not the end of the analysis. When a contract does not, as a matter of law, foreclose reliance, its language does not become irrelevant. As noted, *supra* at sections II(B)-(D), the existence of a duty to disclose, and the reasonableness of reliance may be affected by the terms of the contract. *See, e.g., Hoover Universal, Inc.,* 809 F.2d at 1044; *Horner v. Ahern,* 153 S.E.2d at 221 (noting that plaintiffs relied heavily on a contract clause to establish a duty to disclose); *Banque Arabe,* 57 F.3d at 155–156; *Bank of the West,* 41 F.3d at 477–478; *First Financial Fed. Savings & Loan Assoc. v. E.F. Hutton Mortgage Corp.,* 834 F.2d 685, 688 (8th Cir.1987) (reliance was unjustified because contract stated that no information given by defendant was relied upon); *Banco Totta e Acores,* 768 F.Supp. at 948–949. The duty to disclose and the reasonableness of reliance remain questions to be decided by the jury in light of, *inter alia,* the nature of the parties and the transaction, the representations, omissions, and distractions presented by the defendant, and the duties of investigation assumed by the plaintiff. *See Miller v. Premier Corp.,* 608 F.2d 973, 982 (4th Cir.1979) (reasonableness of reliance is question of fact for jury to decide). *Cf. Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc.,* 993 F.2d 1178, 1186 (5th Cir.1993) (reversing grant of summary judgment because material issue of fact existed as to justifiable reliance). Here, the jury needed to see the terms of the Participation Agreement in order to determine the reasonableness of BMO's reliance on Signet's representations and omissions. It was therefore an abuse of discretion to refuse to admit this piece of evidence which was fundamental to the transaction between BMO and Signet.

This error was not harmless—it affected the substantial rights of Signet. *See* Fed.R.Civ.P. 61; 28 U.S.C.A. § 2111. We cannot say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole,

that the judgment was not substantially swayed by the error, [therefore] it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See also Taylor v. Virginia Union Univ.,* 193 F.3d 219 (4th Cir.1999) *(en banc )* (formally adopting the *Kotteakos* harmless error standard for civil cases). The absence of the Participation Agreement prevented the jury from gaining a full understanding of the nature of the transaction between Signet and BMO. Further, BMO was able to offer evidence on what information it expected from Signet, while Signet had its hands tied in showing that BMO had assumed certain duties.

BMO argues that Signet was not prejudiced because the evidence would only have been cumulative—BMO never disputed that it was required to perform due diligence, and some evidence was produced on BMO's due diligence duties and activities. *See Mosser v. Fruehauf Corp.,* 940 F.2d 77, 81 (4th Cir.1991); *Buschow v. Smith,* 420 F.2d 962, 962 (4th Cir.1970). But, there is a vast difference in this action for fraud, involving questions of disclosure duties and justifiable reliance, between evidence that BMO voluntarily performed its own due diligence because that was BMO's standard practice (the evidence adduced at trial) and evidence that BMO was prompted by Signet's disclaimers to perform its own investigation (the evidence excluded from the trial). Given the great importance of the Participation Agreement to the proper development and evaluation of material elements of the cause of action, it was not harmless to exclude that evidence. *See Schultz v. Butcher,* 24 F.3d 626, 632 (4th Cir.1994).

## B. *Other Evidentiary Rulings*

Either Signet or BMO has challenged various other evidentiary rulings: the admission of the Pickin' Parlor Notes, the admission of evidence relating to the BNS

claim, the admission of evidence relating to the WRE letter, and the refusal to admit evidence concerning Signet's knowledge that Project Star was seeking to evade regulations on human testing. We have considered the parties' arguments and find no abuse of discretion. We note, though, that given our rejection of the BNS claim, the district court will need to reconsider at least the purpose for which these facts may be admitted on retrial.

## IV. Dismissal of Breach of Contract Claim

BMO appeals from the district court's grant of summary judgment for Signet on BMO's claim that Signet breached its contractual duties to BMO.

█ We review a grant of summary judgment de novo. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir.1988). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Contract interpretation is a subject particularly suited for summary judgment disposal. *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir.1988).

BMO argues that Signet violated the terms of the Participation Agreement because Signet failed to administer the loans with the degree of care customary in the industry and acted with gross negligence and willful misconduct in violation of § 7 of the Participation Agreement. Specifically, BMO argues that Signet's failure to inform BMO of five pieces of information violated that duty: (1) its rejection of the Authorization Certificate, (2) its knowledge that the government was involved with Project Star, including a letter from Reiners to that effect, (3) a letter from Reiners describing the relationship of Philip Morris to WRE, (4) its knowledge that Project Star was offshore to evade FDA regulations on human testing, and (5) the Bank of Nova Scotia information. Further, BMO argues that Signet's failure to turn over the first three of these documents violated its obligations under § 5(b) of the Participation Agreement.

The district court held that none of these alleged failures breached the contract. The court held that § 5(b)'s duty to turn over documents created only a prospective duty for Signet to turn over documents received after the Participation Agreement went into effect. Because the Authorization Certificate was received before the Participation Agreement went into effect, there was no breach from its non-disclosure. Further, Signet never actually had possession of the second document, so it could not have had a duty to turn that document over. Finally, BMO admitted in court that the failure to turn over the third document, standing alone was not a breach. We affirm the district court's holding with respect to § 5(b).

The district court also rejected BMO's claim under § 7 of the Participation Agreement. The court held that § 7's duty to "administer the Assets" did not include a duty to pass on material information to participating banks. Once again, we affirm the district court's interpretation of the contract.

## V.

To conclude, we vacate the verdict and remand for a new trial. At the new trial Signet should be allowed to admit the Participation Agreement; the district court should not allow the BNS claim to be treated as an independent theory of liability; and the jury should be instructed that a fraud by concealment claim requires that the nondisclosure be deliberate. On retrial the district court need not revisit its dismissal of the breach of contract claim, the constructive fraud claim, or the other theories of fraud initially advanced by

BMO. Nor need the district court reconsider its other evidentiary rulings. Because of our disposition, we need not reach various other issues raised by BMO and Signet for appeal, including Signet's Rule 59 motion based on alleged juror confusion.

*IT IS SO ORDERED*